**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRISTOPHER STOWE, HERB MEYEROWITZ, JIM FALLOW, JAY LITTLE, MAVERICK WATSON and HEIDI FENTON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> HEARST MAGAZINE MEDIA, INC., d/b/a BICYCLING <br><br><br> Defendant. | C.A. No.: <br><br> **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

OF COUNSEL:

Mark S. Reich*
Michael N. Pollack*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
mreich@zlk.com
mpollack@zlk.com

*Pro hac vice forthcoming*

P. Bradford deLeeuw (DE Bar #3569)
**DELEEUW LAW LLC**
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
(302) 351-6905 (fax)
brad@deleeuwlaw.com

*Counsel for Plaintiffs*

1

Plaintiffs Christopher Stowe, Herb Meyerowitz, Jim Fallow, Jay Little, Maverick Watson and Heidi Fenton ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, bring this class action complaint against Defendant Hearst Magazine Media, Inc., d/b/a Bicycling, ("Hearst" or "Defendant"), which is in the business of delivering pre-recorded audio-visual materials on its website https://www.bicycling.com/ (the "Website") to subscribers. On the Website, Defendant utilized tracking tools to intercept and disclose consumers' search terms, video watching information (via query string parameters, detailed URLs, and metadata), and identifiable information (collectively, "Sensitive Information") without seeking or obtaining consumers' consent (collectively, the "Tracking Tools"). The Website's use of the Tracking Tools resulted in violations of the Video Privacy Protection Act (VPPA), state and federal wiretap statutes, and invasions into consumers' privacy. In other words, this transmission of Sensitive Information to Facebook is achieved through Defendant's adoption of the Tracking Tools, such as the Facebook Pixel, which Facebook designed in such a way to allow third parties to determine what data it will collect from its users and transmit back to Facebook. From a menu of options, Defendant chooses how it will use the Pixel, including what video viewing information is transmitted, when (or what event triggers) data transmission, and the form in which said data is transmitted back to Facebook. The information related to the pre-recorded videos that are watched and then transmitted back to Facebook to link it to

2

the individual using the Facebook ID so it can then capitalized on by Defendant to push out more content and advertisements it feels the user would be interested in based on the ever-evolving Facebook profile. Plaintiffs alleges the following upon information and belief based on the investigation of counsel, except for those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action brought on behalf of all Users (defined below), whose Sensitive Information was improperly intercepted, collected, and/or disclosed as a result of Defendant's decision to employ Tracking Tools on the Website.

2.     Hearst, through the Website which it owns and operates, offers Users subscriptions in various forms, including a free e-newsletter by providing their personal information or to digital and physical magazines by paying money

3.     The Website offers several subscription offerings, including to: (1) a paid subscription to "Bicycling" which grants members access to exclusive content and a subscription to the print Magazine, among other perks, by providing personal information, such as their full name, email address, and physical address, and a monthly payment ("Members"); and (2) free subscriptions to the Website's newsletter, in exchange for providing personal information, such as their full name and email address (collectively with Members, "Subscribers").

4.      The Website allows visitors to use the Website's built-in search bar (the "Search Bar") to search for and watch videos by typing search terms into the Search Bar (collectively with Subscribers, the "Users").

5.      Defendant does not disclose on the Website that Users' Sensitive Information would be captured by Tracking Tools utilized by Defendant, and then transmitted to the third parties who developed and offered the Tracking Tools (the "Tracking Entities"), including Meta Platform Inc. ("Meta" or "Facebook") and Google LLC ("Google").

6.      The Personal Viewing Information at issue includes Plaintiffs' and Subscribers' (i) Facebook ID ("FID," discussed and defined herein) and (ii) the detailed URL containing the title or description of the video, in addition to the "path"[1] to the webpage file containing video.[2]

7.      At no point during or after the sign-up process – or anywhere on the Website for that matter – does Defendant seek or obtain consent for the sharing of Users' Sensitive Information, which Defendant surreptitiously gathered through the use of such Tracking Tools.

***Video Privacy Violations***

---

[1] The "path" contains the exact location of the webpage file on Defendant's server.
[2] *See* 18 U.S.C. § 2710(a)(3) (defining personally identifiable information under the VPPA as information able to identify consumers, as well as the title, description, or summary of video materials or services requested or obtained from a video tape service provider).

8.      In today's data-driven world, individuals must remain wary of how companies share data, as these policies can significantly impact the privacy and security of any personal information provided through a service or subscription.

9.      Congress has recognized the immediate and irreversible harm caused by disclosing a person's "personally identifiable information" (PII), as defined to include video materials and services requested or obtained by consumers.

10.     Congress' enactment of the VPPA, and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers,[3] such as Defendant, from sharing consumers' PII without valid consent.[4]

11.     Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a consumer's PII is shared.

12.     By deploying Tracking Tools on its Website, Defendant ensures that Subscribers' Personal Viewing Information is transmitted the moment a User requests or accesses video content. The Personal Viewing Information transmitted by Defendant's Pixel qualifies as PII under the VPPA. Defendant, not Facebook, is responsible for installing the Pixel on the Website to effectuate the VPPA violations alleged herein. *See* Section C(2)).

---

[3] 18 U.S.C. § 2710(a)(4).
[4] 18 U.S.C. § 2710.

13. Defendant determines what data the Pixel collects from Subscribers and transmits to Facebook. Through a range of configurable Pixel settings, Defendant can select what Personal Viewing Information—typically contained in small data files known as "cookies"—is transmitted and linked to specific individuals.

14. The Personal Viewing Information transmitted back to Facebook is linked to an individual by an unencrypted FID stored in the c_user cookie, as well as encrypted identifiers contained in the fr and datr cookies.

15. Facebook and Defendant both benefit from receiving and analyzing the Personal Viewing Information by using such data to target Subscribers with more personalized advertising across its own marketing platforms.

16. The VPPA requires that any consent to protected disclosures must be in a form that is "separate and distinct" from other legal and financial obligations, and that such consent be informed and written. 18 U.S.C. § 2710(b)(2)(B); 2710(b)(2)(B)(i).

17. Defendant does not seek and has not obtained VPPA-compliant consent from Subscribers to utilize the Pixel to track, share, and exchange their Personal Viewing Information, with Facebook.

18. When a party, such as Hearst, decides to incorporate the Pixel on its Website, Facebook provides them with details about its functionality, including the

collection and disclosure of its Subscribers' legally protected PII.[5]    Defendant cannot claim ignorance.

19.    Indeed, Defendant is made acutely aware that one of the core functions of the Pixel is to collect and share PII and to "use that information to provide measurement services[] [and] target and deliver ads."[6]

20.    Furthermore, Facebook also advises and directs website owners that there are notice and consent requirements associated with the use of the Pixel, and that website owners, such as Defendant, are responsible to provide that notice and obtain those consents.

21.    Despite such warnings, Defendant chose not to obtain Subscribers' VPPA-compliant consent before disclosing Subscribers' Personal Viewing Information to Facebook via the Pixel.

22.    Accordingly, Subscribers' VPPA-protected PII was disclosed to Facebook by Defendant without their consent. Subscribers of the Website have been harmed as a result of violations of the VPPA.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the

---

[5]    *See, e.g., Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("You represent and warrant that you have provided robust and sufficiently prominent notice to [consumers] regarding the Business Tool Data collection, sharing and usage . . . Meta[] may use cookies web beacons and other storage technologies to collect or receive information from your websites . . . .") (last visited Sept. 23, 2024).
[6] *Id.*

Pixel from the Website, or (ii) add adequate notices and obtain the appropriate consent from Subscribers.[7]

*Wiretap Violations*

23.    Federal and state legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

24.    Congress passed the Federal Wiretap Act, which prohibits the unauthorized interception of electronic communications.

25.    26.    Pennsylvania passed the Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. C.S. § 5701 et seq. WESCA "prohibits the interception of wire, electronic, or oral communications, which means it is unlawful to acquire those communications using a device

26.    California passed the California Invasion of Privacy Act ("CIPA"), which attaches liability to any person who, willfully and without the consent of all parties to a communication, attempts to read or to learn the contents or meaning of

---

[7] Website owners like Catholic Answers also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook. *See Meta for Developers: Advanced Matching*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching#security (last visited Sept. 23, 2024).; *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission") (last visited Sept. 23, 2024).

any message or communication while it is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California.[8]

27.    CIPA also prohibits the installation of a "pen register or a trap and trace device without first obtaining a court order . . . ."[9]

28.    Defendant purposefully implemented and utilized the Tracking Tools, to secretly facilitate the interception of Users' electronic communications[10] with the Website, in the form of their Intercepted Information. Defendant knew that the Tracking Tools would feed Users' communications to the Tracking Entities.

29.    The Website does not provide notice of or obtain consent as to such practices.

30.    Users of the Website have been harmed by Defendant, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the Tracking Tools from the Website, or (ii) add, and obtain, appropriate consent from Users.

---

[8] Cal. Penal Code § 631(a).
[9] Cal. Penal Code § 638.51.
[10] The Wiretap Act defines "electronic communication" as any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects interstate or foreign commerce. 18 U.S. C. § 2510(12).

31.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated. Plaintiffs seek relief in this action individually and on behalf of Users of the Website for the common law tort of intrusion upon seclusion and for violations of the VPPA, 18 U.S.C. § 2710; the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e);  WESCA; 18 Pa. C.S.A. § 5701;, and CIPA, Cal. Penal Code §§ 631 & 638.

## PARTIES

32.     Plaintiff Christopher Stowe is a citizen of Pennsylvania and resides in Lewisburg, Pennsylvania. Plaintiff Stowe became a paid subscriber to the Bicycling in or around January 2022. After subscribing to the Website, Plaintiff Stowe requested video content on the it on various occasions and dates from both his phone and desktop computer. Plaintiff Stowe visited the Website through an Edge browser while logged into his Facebook account. Plaintiff Stowe's Facebook profile includes his real name, his work location, state of residency, personal photos, and where he is from. The Website did not obtain Plaintiff Stowe's permission before sending Plaintiff Stowe's information to third parties.

33.     Plaintiff Herb Meyerowitz is a citizen of California and resides in Burbank, California. Plaintiff Meyerowitz became a paid subscriber to the Website in or around 2020. After subscribing to the Website, Plaintiff Meyerowitz requested video content on the Website on various occasions and dates. Plaintiff Meyerowitz visited the Website through a Chrome browser while logged into his Facebook

10

account. Plaintiff Meyerowitz's Facebook profile includes his real name, his job, and personal photos. The Website did not obtain Plaintiff Meyerowitz's permission before sending Plaintiff Meyerowitz's information to third parties.

34.     Plaintiff Jim Fallow is a citizen of Illinois and resides in Batavia, Illinois. Plaintiff Fallow became a paid subscriber to the Website in or around 2015. After subscribing to the Website, Plaintiff Fallow requested video content on the Website on various occasions and dates. Plaintiff Fallow visited the Website through a Safari browser while logged into his Facebook account. Plaintiff Fallow's Facebook profile includes his name, his hometown, and the school he attended. The Website did not obtain Plaintiff Fallow's permission before sending Plaintiff Fallow's information to third parties.

35.     Plaintiff Jay Little is a citizen of Indiana and resides in Elkhart, Indiana. Plaintiff Little became a free subscriber to an email newsletter and purchased a few magazines from the Website in or around 2020. After subscribing to the Website, Plaintiff Little requested video content on the Website on various occasions. Plaintiff Little visited the Website through an Explorer and Chrome browser while logged into his Facebook account. Plaintiff Little has viewed video content about biking using his laptop. Plaintiff Little's Facebook profile includes his name, job, photos, hometown, and the school he attended. The Website did not obtain Plaintiff Little's permission before sending Plaintiff Little's information to third parties.

36.     Plaintiff Maverick Watson is a citizen of California and resides in Chico, California. Plaintiff Watson became a paid subscriber to the Website in or around 2023. After subscribing to the Website, Plaintiff Watson requested video content on the Website on various occasions. Plaintiff Watson visited the Website through a Chrome browser while logged into his Facebook account. Plaintiff Watson's Facebook profile includes his birthdate and profile photo. The Website did not obtain Plaintiff Watson's permission before sending Plaintiff Watson's information to third parties.

37.     Plaintiff Heidi Fenton is a citizen of Pennsylvania and resides in Kersey, Pennsylvania. Plaintiff Fenton became a free subscriber to an email newsletter in or around February 2024. After subscribing to the Website, Plaintiff Fenton requested video content on the Website on various occasions and dates. Plaintiff Fenton visited the Website through a Chrome browser while logged into her Facebook account. Plaintiff Fenton has viewed video content about bicycling nutrition that was directed at her after opening the newsletter. Plaintiff Fenton's Facebook profile includes her real name and the city where she resides. The Website did not obtain Plaintiff Fenton's permission before sending Plaintiff Fenton's information to third parties.

38.     Defendant Hearst Magazine Media, Inc. d/b/a Bicycling owns and operates the Website. Hearst Magazine Media, Inc. is a Delaware corporation, with its registered agent located at Corporation Trust Center, 1209 Orange Street,

Wilmington, DE 19801. Hearst through the Website provides articles ranging from the latest fitness and training tips, profiles of the sport's most engaging riders and characters, to detailed reviews of the latest bikes and gear.

## JURISDICTION AND VENUE

39.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Video Privacy Protection Act, 18 U.S.C. § 2710, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

40.    This Court has personal jurisdiction over Defendant because Defendant is incorporated in the state of Delaware.

41.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business operations in this District, including managing the Website, delivering video content, and Defendant's U.S.-based marketing.

## COMMON FACTUAL ALLEGATIONS

### A.   Legislative Background

#### 1. The Video Privacy Protection Act

42.     Congress enacted the VPPA in 1988 in response to a Washington, D.C. newspaper's profile of then-Supreme Court nominee Judge Robert H. Bork during his confirmation hearings. *See* S. Rep. No. 100–599, 2d Sess., at 5 (1988). The profile contained a list of 146 films Judge Bork and his family rented from a video store, obtained without his knowledge or consent. *Id.*   Members of Congress denounced the disclosure as repugnant to the right of privacy. *Id.* at 5-8.

43.     Recognizing, as Justice Brandeis had decades earlier, that "subtle and more far reaching means of invading privacy have become available," *Olmstead v. U.S.*, 277 U.S. 438, 473 (1928), Congress passed the VPPA so that individuals can "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (1988).

44.     Senator Patrick Leahy explained that the new law was meant to protect "our right to privacy [in] the choice of movies that we watch with our family in our own homes," as "[t]hese activities are at the core of any definition of personhood." 134 Cong. Rec. S5397–01, S. 2361 (May 10, 1988).

45.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any

14

consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

46.    The broad language of the definitions contained in the VPPA comports with the initial purpose of the VPPA—to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." S. Rep. No. 100–599, 2d Sess., at 6 (1988).

47.    In 2012, Congress amended the VPPA "to reflect the realities of the 21st century." 158 Cong. Rec. H6849–01 (Dec. 18, 2012).

48.    In a Senate Judiciary Committee meeting, Senator Leahy stated, "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video

streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[11]

49.    Senator and Subcommittee Chair Hon. Al Franken stated:

One way we need to update this law is to make sure that it is keeping up with technology. It used to be that if you wanted to watch a video, you had to go to the video store or then wait for it in the mail after that. Now you can stream it directly to your computer in seconds. Streaming is the future of video, . . . it is clear that the law does cover new technologies like streaming because it does not just cover ''prerecorded video cassette tapes.'' It also covers ''similar audio-visual materials."[12]

50.    Courts across the country have affirmed a broad reading of the VPPA and its application to modern video sources, such as websites.[13]

---

[11] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on Aug. 9, 2024).

[12] *Id.*

[13] *See, e.g., Mata v. Zillo Grp., Inc.*, 2024 U.S. Dist. LEXIS 229061, at *8-9 (S.D. Cal. Dec. 18, 2024) (VPPA applied to real estate marketplace website); *Fan v. NBA Properties, Inc.*, 2024 WL 1297643, at *3 (N.D. Cal. Mar. 26, 2024) (holding NFT digital platform is a VTSP subject to the VPPA); *Aldana v. GameStop, Inc.*, 2024 WL 708589, at *3 (S.D.N.Y. Feb. 21, 2024) (holding video game seller is a VTSP); *Sellers v. Bleacher Report, Inc.,* 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL*, 2022 U.S. Dist. LEXIS 163706, at *11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

51. Video tape service providers ("VTSPs") are not required to deal exclusively in audio visual content; rather, audiovisual content need only be part of the provider's book of business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

52. The *Salazar* Court also reasoned that "'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not." *Salazar*, 118 F.4th at 548-49*; see also Lee v. Springer Nature Am., Inc.,* No. 24-CV-4493 (LJL), 2025 WL 692152, at *8 (S.D.N.Y. Mar. 4, 2025).

53. The VPPA prohibits the disclosure of "personally identifiable information" (PII), including "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodean Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016).

54. While information that must be combined with new information obtained from additional disclosure sources by the recipient does not qualify as PII, "[a] Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017).

55. Defendant here is a video service provider as it provided pre-recorded audio-visual materials to Plaintiffs and VPPA Subclass Members on its Website.

56.    The relationship between Plaintiffs and Defendant is precisely the type of relationship contemplated by the VPPA.

57.    In this case, Plaintiffs' Personal Viewing Information was knowingly and systematically disclosed to Facebook via the Pixel, without obtaining their consent.

58.    By transmitting Facebook-specific identifiers (i.e., FIDs) and video titles, descriptions, and locations through Facebook's Pixel, Defendant expressly instructed Facebook as to the exact videos and other content Plaintiffs accessed.

## 2. The Federal Wiretap Act

59.    The Wiretap Act, as amended through the 1986 Electronic Communications Privacy Act ("ECPA"), provides a private right of action for private intrusions as though they were government intrusions.[14]

60.    In passing the ECPA, Congress was concerned about technological advancements, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[15]

---

[14] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022), *available at* https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited Mar. 19, 2025).

[15] Senate Rep. No. 99-541, at 2 (1986).

61.     As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications, such as email between users; and (ii) remote computing services such as cloud storage or third party processing of data and files.[16]

62.     An ECPA claim requires a showing that a person or entity "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept to endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device."[17]

63.     "Interception" is defined as "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

64.     An "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

65.     The "paramount objective of the [ECPA] is to protect effectively the privacy of communications." *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013).

---

[16] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[17] *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 900 (C.D. Ca. 2024) (quoting 18 U.S.C. §§ 2510 *et seq.*).

19

66.     The ECPA "protects wire, oral, and electronic communications while those communications are being made, are in transit, and when they are stored on computers."[18]

67.     Courts consistently hold that to violate the ECPA, an interception must be "contemporaneous" with the communication. *See, e.g., Fraser v. Nationwide Mutual Insurance Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *Steve Jackson Games, Inc. v. Secret Service*, 36 F.3d 457, 460 (5th Cir. 1994); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877-78 (9th Cir. 2002); *U.S. v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003).

68.     The "unauthorized duplication and forwarding of unknowing users' information" is among the most common methods of impermissible intrusion. *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).

69.     While communicating with Defendant on the Website, Users had the contents of their communications captured on their web browsers, duplicated, and sent to Defendant and the Tracking Entities.

---

[18] *Bureau of Justice Assistance U.S. Department of Justice, Electronic Communications Privacy Act of 1986 (ECPA), 18 U.S.C. §§ 2510-2523*, BUREAU OF JUST., https://bja.ojp.gov/program/it/privacy-civil-liberties/authorities/statutes/1285 (last visited Mar. 19, 2025)

70. Defendant purposefully tracked and intercepted Plaintiffs' communications with the Website to improve the effectiveness of the Tracking Entities' and Defendant's advertising and marketing capabilities.

71. Plaintiffs did not know of or consent to the interception of their communications to Defendant, which were also unknowingly transmitted to the Tracking Entities.

72. The Tracking Entities were not parties to the communications because Plaintiffs did not know of their involvement in the communications, and the Tracking Entities used the intercepted communication for their own benefit, independent of any benefit received by the Defendant.

### 3. The California Invasion of Privacy Act

73.    CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[19] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[20]

74.    CIPA is regularly recognized as California's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

75.    To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from California.[21]  Notably, for wired communications, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing

---

[19] Cal. Penal Code § 630.[20]*Id.*[21] Cal. Penal Code § 631-32.[22] *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[20]*Id.*[21] Cal. Penal Code § 631-32.[22] *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[21] Cal. Penal Code § 631-32.[22] *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).

with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[22]

76.    CIPA looks to whether a user had a reasonable expectation of privacy, and courts analyzing the expectation of privacy look to the sensitivity of the data at issue. *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). Legally protected or sensitive data have heightened requirements that demand more rigorous notice before intercepting.

77.    CIPA also prohibits the installation of a "pen register" or a "trap and trace device" without first obtaining a court order.[23]

B. **Plaintiffs Have a Privacy Right in Their Search Terms**

78.    As Senator Leahy aptly foresaw, the time has come where companies can easily build profiles of customers based on their consumer habits.

79.    Communications shared between consumers and companies appear to be private but, in reality, the contents of those messages are regularly shared.

80.    Here, Defendant shares Users' information, including search terms, with third parties.

81.    Search terms are inherently private. This is particularly true when the searches are communicated in confidence or presumed to be private. All search

---

[22] *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[23] Cal. Penal Code § 638.51.

terms are personal in nature, but there is an obviously heightened want for the searches to be kept confidential when the search terms themselves contain private information.

82.    As described above, descriptions and summaries of requested pre-recorded audio visual materials tied to individuals are PII and worthy of federal protection.

83.    Users search for video materials on the Website using search terms. The search terms, when associated with descriptions or summaries of the pre-recorded videos, are Sensitive Information and pertain to more than Users' basic privacy.

84.    This private information is then shared with various advertising services, including the Tracking Entities.

85.    The Tracking Entities' collection of broad swaths of personal information further establishes a reasonable expectation of privacy. *See In re Facebook Internet Tracking Litig.*, 956 F.3d at 604-06 (holding plaintiffs sufficiently pleaded a reasonable expectation of privacy to survive a motion to dismiss where Facebook allegedly compiled highly personalized profiles from users' sensitive browsing histories and habits).

86.    Users, including Plaintiffs, maintain the expectation that Tracking Entities will not be able to collect such breadth of personal information absent consent. *See id.* at 604 n.7.

C. **How Websites Function**

87.      Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

88.      Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[24]

89.      Each webpage has a unique address, and two webpages cannot be stored at the same address.[25]

90.      When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[26]

---

[24] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Nov. 18, 2024).

[25] *Id.*

[26] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Sept. 17, 2024).

91.    An IP address is "a unique address that identifies a device on the internet or a local network."[27] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

*Id.*

92.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address. This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[28]

93.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[27] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Nov. 18, 2024).
[28] *Id.*

94.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[29] as depicted below:



*Figure 1 - Mozilla's diagram of a URL, including parameters[30]*

95.    Website owners or web developers write and manage the URLs for their websites.

96.    URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[31] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

97.    The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and

---

[29] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[30] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Sept. 17, 2024).

[31] *Id.*

electronic devices.[32] Today, UTF-8 is the Internet's most common character encoding.[33]

98.    URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[34] To demonstrate:



*Figure 22 – Demonstrating URL encoding and decoding*[35]

99.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

---

[32]    *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 20, 2025).

[33] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited May 20, 2025).

[34] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited May 20, 2025).

[35] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 20, 2025).



*Figure 33 – Sample webpage used to demonstrate a webpage URL*



*Figure 44 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*



*Figure 55 – Decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

100.   After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code that of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML

code.[36]  This is the visible, and usually interactable, website that most people think of.

101.   To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[37]

102.   Such complex tasks include streaming videos by Users or subscribing to Newsletters/ Digital/Print Magazine, or code used to monitor and report user activity.

## D. Hearst and the Facebook Tracking Pixel

### 1. The Facebook Pixel as a Tracking Tool

103.   Boasting 2.9 billion monthly active consumers, Facebook is the largest social networking site on the planet.[38] Facebook is a "real identity platform,"[39] meaning consumers are allowed only one account and must share "the name they

---

[36]  *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Sept. 17, 2024).

[37]  *See JavaScript Basics*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Nov. 18, 2024).

[38]  Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[39]  Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021 4:05 PM). https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

go by in everyday life."[40] To meet that goal, Facebook requires consumers, when creating an account, to provide their first and last name, along with their birthday and gender.[41]

104.   Approximately seven-in-ten U.S. citizens have a Facebook profile[42] – all of whom provided the same personal information to Meta when creating their Facebook profiles.

105.   Facebook monetizes account holders by selling companies access to their Facebook feeds, including to website owners like Defendant.[43]

106.   Facebook's advertising capabilities are valuable because of its ability to effectively target consumers with meaningful or relevant advertising.[44] Facebook can target consumers so effectively because it monitors and analyzes user activity both on and off its site.[45] This allows Facebook to infer details about consumers

---

[40] *Community Standards, Part IV Integrity and Authenticity*, FACEBOOK, https://www.facebook.com/communitystandards/integrity_authenticity (last visited Nov. 18, 2024).

[41] *Sign Up*, FACEBOOK, https://www.facebook.com/ (last visited Sept. 17, 2024).

[42] Katherine Schaeffer, *5 Facts about how Americans use Facebook, two decades after its launch*, PEW RSCH. CTR. (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited June 6, 2025).

[43] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[44] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Nov. 18, 2024).

[45] *Id.*

32

beyond what consumers explicitly disclose, like their "interests," "behavior," and "connections."[46] Facebook compiles this information into a generalized dataset called "Core Audiences," which website owners can sort through using highly specific filters and parameters to make sure their targeted advertisements are aimed at consumers likely to positively respond.[47]

107.    Website owners can build "Custom Audiences,"[48] which enable them to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[49] Meta's Custom Audience feature enables the direct targeting of existing customers and to build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[50] Unlike Core Audiences, Custom Audiences

---

[46] *Audience ad targeting,* META,    https://www.facebook.com/business/ads/ad-targeting (last visited Nov. 18, 2024).

[47] *Easier, More Effective Ways to Reach the Right People on Facebook*, FACEBOOK, https://www.facebook.com/business/news/Core-Audiences (last visited Sept. 17, 2024).

[48]    *About    custom    audiences*,    FACEBOOK, https://www.facebook.com/business/help/744354708981227?id=24690979533764 94 (last visited Nov. 18, 2024).

[49]    *About    an    events    custom    audience*,    FACEBOOK, https://www.facebook.com/business/help/366151833804507?id=30036058427127 3 (last visited Nov. 18, 2024).

[50]    *About    lookalike    audiences*,    FACEBOOK, https://www.facebook.com/business/help/164749007013531?id=40166839044232 8 (last visited Nov. 18, 2024).

require an advertiser to supply consumers' data to Facebook. Website owners can do so through two mechanisms: by manually uploading contact information for customers in the form of "lists," or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[51]

108.   Websites which provide video or streaming content may choose to embed code that allows third-party advertisers to track consumers' activity, including searches and page views. These tracking tools collect and transmit information in real-time.

109.   Here, Defendant made use of Meta's Business Tools and lists to disclose Subscribers' Sensitive Information to Meta.

110.   For example, Meta offers the Pixel and the Conversions API. Where "the Pixel lets you share web events from a web browser[,] . . . the Conversions API lets you share web events directly from your server."[52]

111.   The Pixel is a piece of code that website owners, like Defendant, can integrate into their websites. Once activated, the Pixel "tracks the people and type

---

[51]   *Create a customer list custom audience*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=246909795337694 (last visited Nov. 18, 2024); *Create a website custom audience*, FACEBOOK, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last visited Nov. 18, 2024).

[52] *About deduplication for Meta Pixel and Conversions API events*, FACEBOOK, https://www.facebook.com/business/help/823677331451951?id=1205376682832142 (last visited Nov. 18, 2024).

of actions they take."[53] When the Pixel captures an action, it sends a record of the action to Facebook. After receiving the Pixel transmission sent by a website owner, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

112. Because Facebook designs the Pixel to be installed onto Users' browsers, as well as the system receiving the information, it is in complete control of how simple or complex its transmissions appear. For example, Facebook requires that website owners encode their Pixel transmissions using UTF-8 encoding, the process of preparing data to be transmitted across the Internet described in Section B.

113. The Pixel collects and sends all the information needed to identify Users in a single transmission, including IP addresses.[54] The Pixel does not require obtaining any additional information from other websites to piece Users' identities together.

114. Meta's "Get Started" page further explains how it can identify Users and match them to their Facebook pages: "[The Meta Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook

---

[53] *Retargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited Nov. 18, 2024).
[54] *See Customer Information Parameters*, META, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited May 21, 2025).

User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[55]

115.   Facebook designed the Pixel, as well as the computer system that receives and parses the data that the Pixel intercepts, collects, and transmits to Facebook. Facebook had total control over the form, function, and complexity of the Request URLs generated through the Pixel, and the data collected and transmitted by the Pixel was as easy or as difficult to read as Facebook desired.

116.   Facebook designed the information received via Pixel transmissions to allow any ordinary person to read and understand the contents of information shared with Facebook.

117.   Even though some of the information disclosed is technical in nature, any ordinary person can easily surmise what video content a person requested or obtained because it directly tracks the name of the video as it appears on the user's screen, as well as that person's FID — an easily identifiable and unique string of numbers tied to the individual.

118.   Indeed, Facebook had control over how this information was transmitted and received. Facebook chose to use the most common encoding system

---

[55] *Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited June 6, 2025).

to transmit data across the Internet, an encoding system that common internet browsers can easily decode and parse into easy-to-understand information.

119.    After receiving the Pixel transmissions, Facebook also leveraged the received data to build detailed profiles for targeted advertising based on a consumer's video-watching habits.

120.    After processing the data, Meta also makes much of the data available to the website owner through the "Event Manager" tool.[56]

121.    However, to make use of the Pixel, website operators and/or owners, such as Defendant, must first agree to the Meta Business Tools Terms.

122.    The Meta Business Tools Terms directly inform website developers that implement the  Pixel how the Pixel operates.

123.    Meta explicitly informs website developers that implement the  Pixel that using the Pixel will result in Facebook receiving Users' information "that personally identifies [them] . . . " ("Contact Information") and information "about [Users] and the actions they take on your websites . . ." ("Event Data").[57] The terms also warn website developers that Facebook will "process the Contact Information

---

[56]    *About    Meta    Events    Manager*,    FACEBOOK, https://www.facebook.com/business/help/898185560232180?id=12053766828321 42 (last visited Nov. 18, 2024).
[57]    *Meta    Business    Tools    Terms*,    *Section    1(a)(i)-(ii)*,    FACEBOOK, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY4CZdRHnQNL2 -VtXBCcMUcg-6J-5jU8AL4hOLViKhAWi-SbNmA4QuXlc6yyk877eY&_rdr (last visited Nov. 18, 2024).

solely to match the Contact Information against" FIDs, "as well as to combine those [FIDs] with corresponding Event Data."[58]

124.    Meta also requires website developers that implement the Pixel to "represent and warrant that [they] . . . have all the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data."[59]

125.    Additionally, Meta requires website developers that implement the Pixel to "represent and warrant that [they] will not share Business Tool Data with [Meta] that . . . includes . . . categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." [60]

126.    In short, Meta explicitly describes that the Pixel combines Users' identifying information with their activity on websites to build marketing profiles and, as a result, that websites should not share sensitive information using the Pixel.

127.    Despite Meta's warnings, website owners ultimately have control over what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will be active for on websites. These events, in turn, determine what data is collected,

---

[58] *Id.* at Section 2(a)(i)(1).
[59] *Id.* at Section 1(e).
[60] *Id.* at Section 1(h).

including the website's query string parameters, metadata, and what pages a visitor views.[61]

128.   Defendant, as a website owner, controls how the Facebook Tracking Pixel identifies Users.

129.   While Defendant's Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data," Defendant chooses which events to monitor and which parameters and metadata are collected and sent to Facebook.[62]

130.   HTTP Headers include "IP addresses, information about the web browser, page location, document, referrer and data potentially identifying persons using the website."[63] Pixel-specific Data includes "the Pixel ID and cookie[s],"[64] which can also identify persons using the website.

131.   Website owners can configure the Facebook Pixel to track events other than Meta's menu of "standard events," which contain events that can track what

---

[61] *See Meta Pixel, Accurate Event Tracking, Advanced*, FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Nov. 18, 2024); *see also Best practices for Meta Pixel setup*, FACEBOOK, https://www.facebook.com/business/help/218844828315224?id=12053766828321 42 (last visited Nov. 18, 2024).

[62] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/facebook-pixel/ (last visited Nov. 18, 2024).

[63] *Id.*

[64] *Id.*

content a visitor views or purchases.[65] A website owner can also create their own "custom events," allowing them to track designated user activity and data through events programmed specifically for that purpose on advertiser's website.[66]

132. The Pixel activates when one of the events being monitored by a website occurs, such as loading a web page or a specified action, such as clicking a button.

133. Once a Pixel activates, it copies relevant information from the communication between the user and website, such as URLs, user activity, search terms, metadata, query string parameters, and Pixel-specific Data, including cookies. The Pixel then bundles that information together, and transmits that copied bundle to Meta through a "GET" or "POST" HTTP Request.

134. The Request URL generated by the Pixel contains much of this information as parameters, while cookies are included in the HTTP Headers. *See* Figure 13.

**2. Hearst Implemented the Facebook Pixel on the Website.**

135. To activate and employ a Facebook Pixel, a website owner must first

---

[65] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 18, 2024).

[66] *About standard and custom website events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Nov. 18, 2024).

sign up for a Facebook account, where adding the Pixel to the website owner's "business portfolio" provides the most utility for using the Pixel.[67]  For instance, business portfolios can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Pages, Instagram accounts, ad accounts, and catalogs from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) post or analyze data analytics collected from Facebook pages or Instagram accounts, (v) run ads businesses across Facebook and Instagram, and (vi) create and manage shops across Facebook and Instagram.[68]

136.   To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[69]

137.   The website owner or operator must tell Facebook which website events it wants to track and Facebook returns corresponding Facebook Pixel code for the website owner or operator to incorporate into its website.

---

[67] *How to set up your Meta Pixel with a business portfolio*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=12053766828321 42 (last visited Mar. 26, 2025).

[68] *About business portfolios*, FACEBOOK, https://www.facebook.com/business/help/486932075688253 (last visited Mar. 26, 2025).

[69] *Id.*; *see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE (Feb. 4, 2022) https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited Mar. 26, 2025).

138.   Moreover, Facebook notes that "[d]evelopers and marketers can *optionally choose* to send additional information about the visit through Custom Data events."[70]

139.   Specifically, Defendant chose to send to Facebook the video content name, the URL of the pre-recorded video that was viewed (which clearly identified the video content being watched by title), along with the viewer's FID. Defendant made a conscious decision to share Subscribers' Personal Viewing Data with Meta.

140.   Once the Pixel is installed, the website operator assigns access to the Pixel to specific people for management purposes,[71] and must connect the Pixel to a Facebook Ad account.[72]

141.   After following these steps, a website operator can start capturing and sharing information using the Pixel.

142.   Once more, a Pixel cannot be placed on a website by a third-party.  It must be placed directly by or on behalf of the site owner. Hearst did just this.

---

[70] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ (last visited June 6, 2025).

[71] *Add people to your Meta Pixel in Meta Business Suite or Business Manager*, FACEBOOK, https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited  Mar. 26, 2025).

[72] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited Mar. 26, 2025).

### 3. The Facebook ID Allows an Ordinary Person to Identify a Subscriber and their Video-Viewing Habits.

143. Facebook maintains vast amounts of data on each of its account holders, like Plaintiffs and Class Members.

144. In addition to the information every user is required to provide to Meta when creating an account (including first and last name, date of birth, gender, email address and/or phone number, and password), Meta also possesses and has access to all of the information every user has ever posted on his or her Facebook profile, profile views, likes, comments, shared and/or reposts, event invitations, event RSVPs, Facebook messages, "check-ins," and much, much more.

145. This data is not limited to only what a person does on Facebook, but also includes all records relating to when a user is tracked on off-Facebook websites, such as Plaintiffs' and Class Members' interactions with the Website.

146. The Pixel continuously adds data from new interactions to the historical profiles Meta maintains on individuals with Facebook profiles (and even for a time after Facebook account holders delete their Facebook profiles).

147. Crucial to the Pixel's effectiveness is its ability to associate a user's interactions on websites across the internet with that specific user's unique Facebook profile. This is made possible through, most notably, the FID.

148.    An FID—commonly known as the "c_user field—is a unique and persistent identifier that Facebook assigns to each user. It contains a series of numbers used to identify a specific profile, as depicted below:

c_user=100091959850832;

*Figure 6 - Sample FID number of test account created by Plaintiffs' counsel in a prior investigation into the Pixel, captured by a Pixel event*

149.    A FID can be used by anyone to easily identify a Facebook user by simply appending the FID to www.facebook.com (e.g., www.facebook.com/[FID_here]).

150.    Facebook itself publishes explanations and help-center materials confirming that a FID is a string of numbers that connects to a specific profile and can be entered into the URL bar to navigate directly to that profile. Ordinary internet consumers – roughly seven-in-ten Americans – are among Facebook's account holder base and regularly encounter URLs and learn from Facebook's own help pages on how to find and use FIDs.[73]

151.    A simple search for "what is a c_user cookie" leads one to learn that the string of numbers is the FID of the user, demonstrating that even non-technical

---

[73] Katherine Schaeffer, *5 Facts about how Americans use Facebook, two decades after its launch*, PEW RSCH. CTR. (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited June 6, 2025).

internet consumers can, without specialized knowledge, discover and apply a FID to locate a given Facebook profile.



*Figure 7 – Google AI answer to search for "what is the c_user cookie"*

152.   A subsequent Google search for "facebook user id" reveals that the URL of a Facebook profile is facebook.com followed by the FID.



*Figure 8 – Google AI answer to search for "facebook user id"*

153.   Even simpler, with the rise in General Artificial Intelligence agents such as ChatGPT, anyone with an internet connection can use tools to decipher computer code, as demonstrated below.

46

Cookie

datr=SRe2ZwkqD1MICziMOaVSbrBb; sb=axe2Z3ELf4psOiSR5g4mAbnw; ps_n=1; c_user=██████████ fr=1pt1CrZUb5GCIKrsE.AWf9w0OWi6U7vLypxV2ASHrQbvGC1HbHs4N2zS9Z_yAtcwFYg hs.BoONEO..AAA.0.0.BoONEO.AWePM8vKPdJ0voFcIFNQPsmTNsU; xs=16%3A2Jkg3ou-pgMbfQ%3A2%3A1739986850%3A-1%3A-1%3A%3AAcU9K7MEQI5AH9t7NzLyUbCqy-P5BBoaBeHEfV2AVYo; ar_debug=1

*Figure 9 – Screenshot from a browser's developer tools of cookies transmitted from a Pixel transmission (c_user redacted)*



Identify the person who watched the video

The cookie header you've provided includes this key-value pair:

| ini | Copy    Edit |
|---|---|
| c_user=██████████ | |

This is a **Facebook user ID** that corresponds to the person who was **logged into Facebook** in the browser session when the video was accessed.

## Can this ID identify the person?

- **Yes, but only within Facebook's system.**
  The `c_user` value (██████████) is a unique Facebook user ID tied to an account. If **you control this browser session** (e.g., it's your own), you could:

  - Paste this URL into your browser:
    `https://www.facebook.com/██████████`

  - It will redirect to the associated profile (if it exists and hasn't been deleted or made private).

*Figure 10 – Screenshot from ChatGPT response to query "Identify the person who watched the video" with screenshot of cookies from Figure 9 (c_user redacted)*

47

154.   To illustrate, appending the FID from *Figure 6* to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 11 - Sample result of appending FID of a user to "facebook.com/" being redirected to the user's profile created by Plaintiffs' counsel in a prior investigation into the Pixel*

155.   Thus, when a URL embedding a FID is disclosed – such as by a video tape service provider, any ordinary user who follows that link will be brought directly to the Facebook profile operating under that ID, thereby identifying the person who watched the video and revealing any public details displayed on that

profile (e.g., photos, posts, Facebook friends, location, occupation, partner/spouse, educational history, etc.).

156.   Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language and country – are "always public."[74] No privacy setting on a Facebook account would allow Plaintiffs, or any account holder, to hide this basic information.

157.   A FID identifies an individual with far greater precision than a name alone, particularly where the name is common or duplicated. For example, while multiple individuals named "John Smith" may exist in the United States—or even on Facebook—only one account will correspond to a particular FID. Possession of a FID therefore allows identification of a unique individual with certainty.

158.   Even if a Facebook profile's displayed name is a pseudonym, the underlying FID still furnishes a clear hook by which third parties can associate specific viewing behavior with a single, uniquely identified human being.

159.   Here, for each of Plaintiffs' interactions on the Website, the Pixel transmitted those interactions to Meta, who was then able to instantaneously associate that interaction with Plaintiffs' personal information that they submitted

---

[74] *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited Nov. 18, 2024).

when creating their accounts, and any personal information ever available on their Facebook profiles through their unique FIDs.

160.   Thus, a FID is not an obscure technical detail but a readily accessible identifier that ordinary people understand and use to connect personal names, profiles, and online activities.

### 4. The Pixel Employed by Hearst Shared Users' Sensitive Information.

161.   Defendant's Website implemented the Pixel.

162.   Defendant added the Pixel to the Website, which it used to invisibly track Users throughout their use of the Website. When a User searched for any video, for example, Defendant disclosed data via the PageView event.



*Figure 12 - Sample search on the Website using search terms "Video Guide"PageView data disclosed what videos a User has searched for.*



*Figure 13 – UFT-8 encoded Pixel transmission[75] containing Search Terms entered by Users*

163. When a Subscriber visited a webpage with video content, another PageView event triggered, transmitting the video's title.

---

[75] For purposes of this Complaint, we provide figures of the encoded URL for convenience, in order to show the URL and cookies within a single image, but the decoded form of the data is available in the Payload tab seen next to the Header tab, similar to the example in Section B.



# on Any Bike

**IN THIS SHORT VIDEO, TEST EDITOR DAN CHABANOV SHOWS YOU HOW TO DO THE POPULAR MOVE.**

BY **DAN CHABANOV**   Published: Jun 30, 2022 4:40 PM EDT

☐ SAVE ARTICLE    ⤳



As the name hints, track stands originated in **track cycling** in the event known as the match sprint. An event in which riders may try track standing to stall for time or force their competitor to take the lead.

**Track standing** is a useful skill for any rider and it can be done on any type of bike. Also, not only does this skill look cool, but learning how to do a track stand can also help you improve your overall balance on the

*Figure 14 – Sample webpage with pre-recorded video content, including video title*

164.



*Figure 15 – PageView Event transmission caused by clicking on a search result, including "video" parameter and video title including episode title in UFT-8 encoded Request URL*

165. When a Subscriber watched pre-recorded videos on the Website while logged into Facebook, the Website compelled a visitor's browser to transmit to Facebook the c_user cookie, which contained that visitor's unencrypted FID, along with other cookies like the datr, xs, fr, and ar_debug cookies, of which the c_user, datr and fr cookies allowed Facebook to link video watching behavior it received to the Facebook user watching the video.76  The event data disclosed by Defendant thus permits an ordinary person to identify the Subscriber through these cookies.

---

[76] *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited    May    20,    2025);    *See    Cookie    Policy*,    BMW,

166.

*Figure 16 – Cookies attached to Pixel transmission*

167. Facebook, at a minimum, uses the c_user, datr, and fr cookies to link to Facebook IDs and corresponding Facebook profiles.

168. By compelling a Subscriber's browser to disclose the c_user cookie alongside event data for video watching, Defendant knowingly disclosed information sufficiently permitting an ordinary person to identify what video a specific individual has watched.

169. Meta admits that "[website owners] provide us with information about [their] existing customers and we match this information with Facebook

---

https://bavarianmotorcars.com/en/cookie-policy (last visited May 20, 2025); *Common cookies and uses*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?annotations[0]=explanation%2F1_common_cookies_and_uses (last visited May 20, 2025).

profiles."[77]The customer lists must contain "'identifier[s]' (such as email, phone number, address)"[78] so that Meta can match the lists to "Facebook profiles" and "[website owners] can advertise to [their] customers on Facebook, Instagram and Audience Network."[79]

170.   While the technical evidence in this case may show the code-based transmission of a FID and video title, Facebook would not need to read or interpret that code manually. Instead, it receives and processes the information through internal systems that automatically extract the meaning of the data, linking a specific user to a specific video, with ease and accuracy.

171.   Meta maintains internal user interface that automatically translate incoming Pixel transmissions into readable, plain-text formats. These interfaces allow Facebook to view and analyze incoming data in human-understandable terms, such as, here, identifying which user watched which video. Although these internal tools are not publicly available, their existence is evidenced by Facebook's technical documentation and operational capabilities, which rely on the ingestion and automated interpretation of Pixel data to serve ads and build user profiles.

---

[77]    *Create a Customer Audience List*, FACEBOOK, https://www.facebook.com/business/help/170456843145568?id=24690979533764 (last visited Sept. 17, 2024).
[78] *Id.*
[79]    *Customer List Custom Audiences*, FACEBOOK, https://www.facebook.com/business/help/341425252616329?id=24690979533764 (last visited Sept. 17, 2024).

172.    Meta stores this broken down, incoming Pixel transmission data in its data warehouse called the "Hive" and can analyze the data to identify data sources and the contents of the transmitted data.[80]

173.    Said differently, Facebook designed its Pixel transmission and reception capabilities to understand who is sending it data via the Pixel and, further, understand what the event data means.

174.    Indeed, even the website operators who implement the Facebook Pixel, like Defendant, have access to dashboards and analytics tools that display Pixel outputs in clear, non-technical terms.



*Figure 17 – Pixel outputs received from a third party's Event Manager for illustrative purposes*

---

[80] *See* Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Motion for Sanctions, *In re Meta Pixel Healthcare*, No. 3:22-cv-03580-WHO (N.D. Cal. Dec. 30, 2024), ECF No. 740.

175.   These tools confirm that both Facebook and its business partners interpret the underlying code using accessible interfaces designed to reveal user behavior in plain English.

176.   *Figure 17* shows, for example, how many PageView events were triggered in a given time frame and any parameters utilized to better match Users to their Facebook profiles.[81]

177.   The dashboard will inform website operators of their event match quality—the better the event match quality, the more likely Pixel events are being matched to Facebook profiles.[82]

178.   Defendant, therefore, disclosed PII because the information transmitted to Facebook—including Subscribers' FIDs and specific video file names—was disclosed in a technical format, but one that is understood by ordinary people once removed from the technical encoding necessary to transmit the data. Much like a person does not understand raw radio waves to hear the sounds carried by the raw radio waves, one still understands the words coming out of the radio once the signal is received and processed by the radio.

---

[81]    *See    About    event    match    quality*,    META, https://www.facebook.com/business/help/765081237991954?id=818859032317965 (last visited June 16, 2025).
[82] *Id.*

### 5. Hearst Was Told the Pixel Discloses Users' Data; It Knew Precisely What the Pixel Would Collect and Share

179.    When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy).[83]

180.    To make use of the Pixel, Defendant agreed to Meta's Business Tool Terms (the "Business Terms").

181.    The Business Terms informs website owners using Facebook's tracking tools that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event Data and Contact Information.[84]

182.    The Business Terms are transparent that the Event Data and Contact Information will be processed ". . . to match the Contact Information against user IDs ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[85]

---

[83] *See Get Started*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/get-started (last visited Jan. 14, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[84]    *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNy hZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited  Jan. 14, 2025); *see* Section C(1).

[85] *Id.*

183.  Facebook directs parties implementing the Pixel – here, Hearst – to encrypt request information[86] *before* data can be shared.[87]

184.  Facebook further provides website developers who implement the Pixel, such as Hearst, guidance on responsible data handling, and details on how data is acquired, used, and stored, including which information it would be sharing with Facebook.

185.  The Business Terms specifically require website developers who implement the Pixel to represent and warrant that they will not share data that includes "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[88]

186.  Facebook educates or reminds website developers who implement the Pixel of their responsibility to inform their consumers of their websites' data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[89]

---

[86] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. GazeboTV has specifically chosen the Pixel method which makes consumers' information visible. *See id.*

[87]     *Meta    Business    Tools    Terms*,    FACEBOOK, https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNy hZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited  Jan. 14, 2025).

[88] *Id.*

[89] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=81885903231796 5 (last visited  Jan. 14, 2025).

187.   Aside from Facebook informing Defendant that it needed "a clear and prominent notice on each web page where [its] Pixels are used[,]" Defendant was also on notice that it must "ensure, in a verifiable manner, that an end user provide[d] all necessary consents before [Hearst] use[d] [Facebook's Pixel] to enable the storage of and access to Meta cookies . . . [i]n jurisdictions that require informed consent."[90]

188.   As a sophisticated party entering into a business arrangement with another sophisticated party, Hearst was on notice of the potential privacy violations that would result from use of the Pixel, and ignored Facebook's warnings to safely handle its Subscribers' data and to warn its Subscribers that the Website would disclose information in a manner that threatened Subscribers' VPPA-protected PII.

**E.   The Website Lack Informed, Written Consent Separate and Distinct from Other Obligations, Pursuant to the VPPA**

189.   The Website does not seek nor obtain permission from Subscribers, including Plaintiffs and the VPPA Subclass, to share Subscribers' Personal Viewing Information with third parties, including Meta and Google.

190.   To the extent information about any of the Website's data sharing can be located, the language is not (i) presented to Subscribers of the site in a transparent manner, or where it must be viewed by Subscribers; (ii) made available as part of the sign-up process; (iii) offered to Subscribers as checkbox or e-signature field, or

---

[90] *Id.*; *see infra* Section C(3).

as any form of consent; and (iv) presented in terms that sufficiently warn Subscribers that their information, protected by the VPPA, will be shared with Facebook.[91]

191. The VPPA has specific requirements for how written and informed consent must be given. Generic references in Defendant's Privacy Policy to the use of cookies and potential third-party data sharing do not equate to the explicit, informed consent required under the VPPA. *See* 18 U.S.C. § 2710(b)(2)(B).

192. Consent under the VPPA also "require[s] video tape service providers to request consumers' consent to a privacy disclosure that addresses only the use of [Personal Viewing Information] . . . and no other privacy topic . . . ." *See Cappello v. Walmart Inc.*, No. 18-cv-06678-RS, 2019 WL 11697705, at *2 (N.D. Cal. Apr. 5, 2019).

193. Defendant's broad Privacy Policy does not expressly authorize the precise form of Personal Viewing Information at issue here. Defendant, therefore did not obtain Subscribers', including Plaintiffs' and the VPPA Subclass', VPPA-required consent.

---

[91] *See Privacy Policy*, CATHOLIC ANSWERS, https://www.catholic.com/privacy-notice (last visited Nov. 18, 2024).

## F. Hearst and the Google Tracking Tools

194.   Google has an array of advertising products, each serving a specific function in advertising portfolios, and each facilitating the interception of Plaintiffs' and Class Member's search terms.

195.   Google's tracking tools are not implemented into websites by Google, but require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

### 1.   Hearst Implements Google Analytics to Intercept Users' Intercepted Information.

196.   Like the Facebook Pixel, Google Analytics ("GA") invisibly collects data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[92]

197.   The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.[93] Notably, Google notifies web developers that they should provide consumers "with clear and

---

[92] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/.

[93]   *Tag Manager Help: About the Google Tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en   (last   visited August 9, 2024).

comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[94]The data collected through GA is sent back to Google, which associates the activity with the website it was collected from.[95] Notably, Google notifies web developers that they should provide consumers "with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[96]

198.    In short, the use of GA involves specific data collection practices, pre-configured settings, and known transmission paths for user data. Google acknowledges the legal risks associated with its tracking tools and explicitly shifts the responsibility for informing website visitors  and obtaining any required consent onto website operators like Defendant.

199.    Here, Defendant added GA to its Website by (1) creating an Analytics account; (2) designating its Website as a property; (3) add a data stream to determine what information to collect; and (4) add the GA tag to its website.[97]

---

[94] *Id.*

[95] *Tag Manager Help: About the Google Tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited August 9, 2024).

[96] *Id.*

[97] *[GA4] Set up Analytics for a website and/or app*, GOOGLE ANALYTICS, https://support.google.com/analytics/answer/9304153?hl=en#zippy=%2Cweb (last visited June 16, 2025).

200.    Defendant's decision to implement GA into the Website resulted in the interception and redirection of Plaintiffs' search terms to Google, as depicted from the example taken directly from the Website below:



*Figure 18 – Test search made on the Website resulted in Google Analytics intercepting search terms "how to track stand" and redirecting them to Google*

201.    After arriving, Google provides analysis and feedback which help Defendant monetize the collected information through targeted advertising.

### 2. Hearst Implements Google Ads on the Website to Intercept Users' Intercepted Information.

202.    Another product, Google Ads (formerly AdWords), is an advertising platform developed by Google, that allows website owners to place bids to display advertisements, service offerings, product listings, or videos to web consumers.[98]

---

[98] *Achieve all your goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited Nov. 15, 2024).

203. To utilize Google Ads, website owners must set up an AdSense account and choose the amount of control they'd like over embedding ads into their website—either through auto ads or ad units.[99]

204. The process website owners using Google Ads utilize to display ads within text-based search results is as follows: (i) website owners create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) website owners then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's search results;[100] (iii) Google then allows website owners to bid on those various keywords;[101] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

205. Google AdSense, works in conjunction with the Google Ads bidding system, allowing website owners to show Google Ads on websites and earn a

---

[99] *Sign up for AdSense*, GOOGLE ADSENSE, https://support.google.com/adsense/answer/10162?hl=en (last visited June 16, 2025); *Sign up for AdSense*, GOOGLE ADSENSE, https://support.google.com/adsense/answer/10162?hl=en (last visited June 16, 2025); *Set up ads on your site*, GOOGLE ADSENSE, https://support.google.com/adsense/answer/7037624 (last visited June 16, 2025).
[100] *Reach the right people with Search Ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited Nov. 15, 2024).
[101] *Id.*

revenue share from each ad each time it is viewed or clicked on their own sites.[102] The search terms that various entities bid for through Google Ads are then used by websites owners using Google AdSense to allow website owners to share in the profit Google generates from the advertising.

206.    AdSense for Content allows website owners to embed ads within the content of their website, i.e., embedded in their articles, blog posts, or sidebars. [103] AdSense for Search displays ads on search result webpages.[104] In either case, AdSense allows the website host to match ads to the website Usersbased on the website's content.

207.    Google Ads intercepted Plaintiffs' search terms, as depicted below:



*Figure 17 – Website sharing the title of the video "how to track stand" with Google*

---

[102] *Home*, GOOGLE ADSENSE, https://www.google.com/adsense/start/how-it-works/ (last visited Nov. 15, 2024).

[103] *See Home*, GOOGLE ADSENSE, https://adsense.google.com/start/ (last visited June 16, 2025).

[104]        *AdSense for Search (AFS)*, GOOGLE ADSENSE, https://support.google.com/adsense/answer/9879?hl=en (last visited June 16, 2025).

208.  Google benefits when website owners, such as Defendant, utilize Google Ads and Google AdSense in connection with their websites by using the data it collects to build an advertising portfolio for each user which includes their gender, age, job industry, and interests.[105] Google then uses user behavior and patterns to improve its own services, develop new products, and increase revenues.

209.  Google profits in several ways from the Website's use of the Google search engine: (i) website owners bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense search, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user search data allows them to further tailor their own products to website owners and consumers alike by training its algorithms with vast amounts of search data.

### 3.  Hearst Implements Google DoubleClick to Intercept Users' Intercepted Information.

210.  DoubleClick for Publishers ("DoubleClick"), now also known as Google Ad Manager, allows website owners to connect with website owners and buy ad space within other websites, and allows website owners to track the performance of their ads across websites.[106] DoubleClick acts as a liaison between

---

[105] *Id*.

[106] *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP, https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/    (last visited June 2, 2023).

a website owner's ad inventory, relevant ad networks, and website owners that are looking to purchase ad space on a website.[107]

211.  DoubleClick works in a similar way to Google Ads and Google AdSense in that it allows companies to buy impressions through the DoubleClick Ad Exchange.[108] A DoubleClick account requires the use of a corresponding Google AdSense account.[109] DoubleClick is typically used for large-scale advertising as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers of over 100 Ad Exchanges.[110]

212.  The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[111] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then

---

[107] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT, https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited June 2, 2023).

[108] *Programmatic advertising overview: DoubleClick by Google*, SUPERMETRICS, https://supermetrics.com/blog/double-click-overview (last visited June 2, 2023).

[109] *DFP Glossary: An Easier Explanation for All the Jargon – How Does DoubleClick DFP Work?*, ADPUSHUP https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited June 2, 2023).

[110] *Programmatic advertising overview: DoubleClick by Google*, SUPERMETRICS, https://supermetrics.com/blog/double-click-overview (last visited June 2, 2023).

[111] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT, https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited June 2, 2023).

submits the ad to DoubleClick where it is reviewed and approved;[112] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[113]

213. Defendant sends Users' Search Terms to Google via the URL googleads.g.doubleclick.net as depicted below:



*Figure 19 – Using the Website's Search Bar results in DoubleClick intercepting and obtaining search terms*

214. The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick Ads are also similar to those provided by Google's search ads. First, Google Ad Manager has various fee structures that can be utilized including a percentage of spend plus a flat monthly fee; a flat monthly

---

[112] *Support: Creating ads on your website with Google DoubleClick for Publishers*, HOCKEYTECH, https://support.hockeytech.com/portal/en/kb/articles/creating-ads-on-your-website-with-google-doubleclick-for-publishers (last visited June 2, 2023).
[113] *DFP Glossary: An Easier Explanation for All the Jargon – How Does DoubleClick DFP Work?*, ADPUSHUP https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited June 2, 2023).

fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month.[114]   Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

215.   As explained above, Adsense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive 51 percent of the revenue recognized by Google.[115]

### 4.  Google Fingerprinting

216.   On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[116]

217.   "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a

---

[114] *How Much Does Google Ads Management Cost?*, JOE BALESTRINO, https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited June 2, 2023).

[115] *Google AdSense Help: AdSense revenue share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited June 2, 2023).

[116] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Apr. 4, 2025).

particular device and user," explains Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[117]

218.  Digital fingerprinting essentially creates a unique digital ID for a user and their device based on various pieces of information collected when you browse the internet, including a user's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[118]

219.  In addition to device identifiers, fingerprinting captures the full range of websites a user visits and apps they use, creating a detailed behavioral map that allows Google to analyze user activity and build comprehensive profiles reflecting consumers' preferences and purchasing tendencies.[119]

---

[117] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Apr. 4, 2025).

[118] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Apr. 4, 2025).

[119] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Apr. 4, 2025); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Apr. 4, 2025).

220.    Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[120]

221.    In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect consumers' privacy, but provides few specifics about how PETs do so.[121]

222.    The ICO finds fingerprinting an unfair means of tracking consumers' online, "because it is likely to reduce people's choice and control over how their information is collected."[122]

223.    The ICO explains:

---

[120] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Apr. 4, 2025); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Apr. 4, 2025).
[121] *Id.*
[122] *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Apr. 4, 2025).

[W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[123]

224. Therefore, even privacy-conscious consumers will find it difficult to escape Google's cross-platform, cross-device tracking.

## G. **Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Intercepted Information**

225. Plaintiffs and Class Members were unaware that the Tracking Tools intercepted their communications in the form of search terms with the Website and browsing history.

226. Plaintiffs and Class Members reasonably believed that communications to the Website were made in confidence.

227. With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiffs were not provided notice of or given an opportunity to provide consent to the Pixel's and other Tracking Tools' interceptions of Plaintiffs' Intercepted Information.

---

[123] *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Apr. 4, 2025).

228. Meta and Google both instruct and caution website operators about the legal risks of using their Tracking Tools without first providing adequate notice and obtaining valid consent for the invasive collection of consumers' protected data. These companies also warn against making such data available to third parties or enabling its interception. Indeed, Meta and Google expressly require website operators to agree not to transmit consumers' sensitive data—even if consent is purportedly obtained. Defendant accepted these terms as a condition of deploying the Tracking Tools on its Website.

229. Plaintiffs were not given notice of the use of the Tracking Tools on the Website.

230. As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their Intercepted Information when visiting the Website, running searches on the Website, and watching videos on the Website.

**TOLLING**

231. The statutes of limitations applicable to Plaintiffs' and the Class's claims were tolled by Defendant's conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

232. As alleged above, Plaintiffs and Class Members did not know and could not have known when they used the Website that Defendant was disclosing their Sensitive Information to third parties. Plaintiffs and Class Members could not have discovered Defendant's unlawful conduct with reasonable diligence.

75

233. Defendant secretly incorporated the Tracking Tools into the Website, providing no indication to Users that their Sensitive Information would be intercepted and disclosed to the Tracking Entities.

234. Defendant had exclusive and superior knowledge that the Tracking Entities' Tracking Tools, incorporated on its Website, would disclose Users' protected and private information and confidential communications, yet failed to disclose to Users that by interacting with the Website, Plaintiffs' and Class Members' Sensitive Information would be disclosed to third parties.

235. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the Tracking Entities' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website subscriber that Defendant was disclosing and allowing the interception of such information to these third parties.

236. The earliest that Plaintiffs and Class Members could have discovered Defendant's conduct was through their investigation and the work performed on their behalf in preparation for filing this Complaint.

## CLASS ACTION ALLEGATIONS

237. Plaintiffs brings this action individually and on behalf of the following Class and Subclasses:

76

238.    All Users in the United States who visited the Website and had their Sensitive Information improperly intercepted by third parties through the use of the Tracking Tools (the "Class").

239.    All Users in the Pennsylvania who visited the Website and had their Sensitive Information improperly intercepted by third parties through the use of the Tracking Tools (the "Pennsylvania Subclass").

> All Users in the California who visited the Website and had their Sensitive Information improperly intercepted by third parties through the use of the Tracking Tools (the "California Subclass")

240.    All Subscribers in the United States who subscribed to the Website, watched pre-recorded video content on the Website, and had their Personal Viewing Information improperly disclosed to and intercepted by third parties through the use of the Tracking Tools (the "VPPA Subclass").

241.    Specifically excluded from the Class and Subclasses are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

242.    Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

243.   This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

244.   Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

245.   Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all Class Members, used the Website to watch videos, donate, or sign-up to the Website's newsletter, and had their Sensitive Information collected and disclosed by Defendant.

246.   Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

247.   Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek redress for the

wrongful conduct asserted herein. If class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

248.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class Members and Subclass that predominate over questions that may affect individual Class Members and Subclass include:

a.  Whether Defendant violated Plaintiffs' and Class Members' privacy rights;

b.  Whether Defendant's acts and practices violated the Common Law Invasion of Privacy;

c.  Whether Defendant's acts and practices violated the VPPA;

d.  Whether Defendant's acts and practices violated the Federal Wiretap Act;

e.  Whether Defendant's acts and practices violated CIPA;

f.  Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief; and

g.  Whether Plaintiffs and Class Members are entitled to statutory or other forms of damages, and other monetary relief.

249. Information concerning Defendant's Website's data sharing practices and newsletter members is available from Defendant's or third-party records.

250. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

251. The prosecution of separate actions by individual Class Members and Subclass would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

252. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

253. Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### (On Behalf of Plaintiffs and the VPPA Subclass)

254. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

255. Plaintiffs bring this count on behalf of themselves and all members of the VPPA Subclass.

256. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

257. "Personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

258. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

259. Defendant violated this statute by knowingly disclosing Plaintiffs' and other VPPA Subclass Members' personally identifiable information (Personal Viewing Information) to Facebook.

260. Defendant, through the Website, engages in the business of delivering pre-recorded video content to Subscribers, including Plaintiffs and the other VPPA Subclass Members. The Website delivers pre-recorded videos to consumers, including Plaintiffs and the other VPPA Subclass Members, by making those

81

materials electronically available to Plaintiffs and the other VPPA Subclass Members on the Website.

261. Defendant is a "video tape service provider" because it curates, hosts, provides access to, and causes the delivery of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

262. Defendant qualifies as a "video tape service provider" under the VPPA. Defendant streams prerecorded video content and collects user data that personally identifies viewers.

263. Plaintiffs and VPPA Subclass Members are "consumers" because they subscribed to Defendant's Website, either through paid membership or free weekly newsletters. 18 U.S.C. § 2710(a)(1).

264. After subscribing, Plaintiffs and VPPA Subclass Members searched for and/or viewed pre-recorded videos on the Website.

265. Defendant, with disclosing to Users or seeking consent, surreptitiously shared Plaintiffs' and VPPA Subclass Members' Personal Viewing Information to Facebook. Defendant utilized the Pixel which forced Plaintiffs' web browsers to transmit Plaintiffs' identifying information, like their Facebook IDs, along with Plaintiffs' and VPPA Subclass Members' event data, including the title of the videos they viewed, to Facebook.

82

266. Defendant knowingly disclosed Plaintiffs' and VPPA Subclass Members' Personal Viewing Information through its implementation of the Pixel, which automatically triggers the transmission of such data. Defendant was specifically informed by the Tracking Entities about how the Tracking Tools functioned, the scope of data collected, and their capability to link individual consumers to their activity on the Website. Once the Pixel completes its automatic exchange, the resulting Facebook ID ("FID") can be used by an ordinary person to readily identify a specific Facebook user. See Section C(3) (process to identify individual using FID).

267. Plaintiffs and VPPA Subclass Members did not provide Defendant with any form of consent—either written or otherwise—to disclose their Personal Viewing Information to Facebook. Defendant failed to obtain "informed, written consent" from Subscribers "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

268. Defendant's disclosure of Plaintiffs' and VPPA Subclass Members' Personal Viewing Information were not made in the "ordinary course of business" as the term is defined by the VPPA. Defendant's disclosure of Subscribers' Personal Viewing Information to Facebook was not necessary for "debt collection activities,

order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiffs' and VPPA Subclass Members' Personal Viewing Information was used for improving marketing effectiveness.

269. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

270. On behalf of herself and the VPPA Subclass, Plaintiffs seek: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the VPPA Subclass by requiring Defendant to comply with VPPA's requirements for protecting a consumer's Personal Viewing Information; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II

### VIOLATION OF COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

271.  Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

272.  Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

273.  Plaintiffs and Class Members maintained a reasonable expectation of privacy in their communications with Defendant via its Website. Users' search terms, browsing history, geolocation data, and website activity have been recognized by society as sensitive information.[124]

274.  Plaintiffs' and Class Members' reasonable expectation of privacy is supported by the VPPA's recognition that PII is sensitive information that must be protected from unauthorized disclosure.

275.  Plaintiffs and Class Members maintained a reasonable expectation of privacy in believing that Defendant, as a video tape service provider ("VTSP"),

---

[124] For example, California voted to pass the California Consumer Privacy Act of 2018, and voted to amend it in 2020 through Proposition 24, the California Privacy Rights Act (CPRA). The CPRA sets out that colling and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

would not disclose their PII to third parties. Defendant had a duty to refrain from sharing such information absent explicit authorization from the user, which it failed to obtain.

276. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) being free to search for and consume audio video materials without observation, intrusion or interference, including, but not limited to, the right to visit and interact with internet websites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

277. Plaintiffs and Class Members possessed a reasonable expectation of privacy based on the belief that Defendant would abide by state criminal laws, such as CIPA. CIPA prohibits Tracking Entities from intercepting communications between consumers, such as Plaintiffs and the Class, and their VTSPs without the consent of all parties involved in the communication. Through its placement of Tracking Tools on the Website, Defendant enabled this interception and resulting intrusion upon Plaintiffs' and Class Members' privacy.

278. As explained above, Defendant's actions constitute a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person because:

    i.    the invasion of privacy occurred in a highly sensitive setting – Plaintiffs' communications with Defendant, a VTSP;

    ii.    Defendant had no legitimate objective or motive in invading Plaintiffs' and Class Members' privacy in such a manner;

    iii.    Defendant violated multiple laws by invading Plaintiffs' and Class Members' privacy, including the Wiretap Act and CIPA;

    iv.    Defendant deprived Plaintiffs and Class Members of the ability to control dissemination of their Sensitive Information; and

    v.    Defendant's actions are also unacceptable as a matter of public policy because they undermine the relationship between consumers and their VTSPs.

279. During the relevant time period, Defendant intentionally invaded the privacy rights of Plaintiffs and Class Members by implementing Tracking Tools on its Website and actively enabling the Tracking Entities to collect and intercept their sensitive and confidential information.

280. As a direct and proximate result of this infringement upon their privacy, Plaintiffs and Class Members sustained harm and experienced various damages. In light of this injury, Plaintiffs and Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

## COUNT III

**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

281. Plaintiffs hereby incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

282. Codified under 18 U.S.C. § 2510 et seq., the Federal Wiretap Act prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

283. The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

284. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

285. The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

286. The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

287. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

288. Defendant is a person for the purposes of the Wiretap Act.

289. The Pixel and other Tracking Tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

290. The confidential communications Plaintiffs had with the Website, in the form of their search terms and browsing history, were surreptitiously intercepted by the Tracking Entities and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

291. Plaintiffs had a reasonable expectation of privacy in their electronic communications with the Website in the form of their search terms submitted to the Website and browsing information.

292. The reasonable expectation of privacy depends on the nature of the contents being intercepted. Sensitive contents, for instance, have stronger expectations of privacy, like health information as protected by HIPAA.

293. The expectation of privacy analysis must begin with reasonable consumers assuming that any contents of their communications that were disclosed were disclosed lawfully—i.e., the assumption that if VPPA-protected information was disclosed, it was disclosed legally. Otherwise, it would create an inference that reasonable consumers should expect that their privacy will be violated illegally.

294. Even if Plaintiffs would not have had a reasonable expectation of privacy in the electronic communications normally, Plaintiffs' electronic

communications with the Websites included descriptions and summaries of the videos they watched, searched for, or requested, along with their personally identifying information, giving rise to a reasonable expectation of privacy pursuant to the VPPA.

295.  Plaintiffs reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Website.

296.  Within the relevant time period, the electronic communications between Plaintiffs and the Website were intercepted by the Tracking Tools the instant they were sent to the Website, without consent, and for the unlawful and wrongful purpose of monetizing their Intercepted Information, which includes the purpose of using such private information to develop advertising and marketing strategies.

297.  Interception of Plaintiffs' confidential communications with the Website occurs whenever they used the search bar within the Website, when navigating various webpages of the Website, including those containing videos.

298.  At all times relevant to this complaint, Defendant's conduct was knowing, willful, and intentional, as Defendant is a sophisticated party with full knowledge regarding the functionality of the Tracking Tools. Specifically, Defendant knew that by allowing the Tracking Tools to be implemented on the Website, the private communications of its consumers would be shared with third parties.

299.   Plaintiffs were not asked for their consent to expose their confidential electronic communications with Website to third parties. Indeed, such consent could not have been given as Defendant did not seek any form of consent from Plaintiffs to intercept, record, and disclose their private communications with the Website.

300.   As detailed above, the Tracking Entities' unauthorized interception and use of Plaintiffs' confidential communications were only possible through Defendant's knowing, willful, or intentional placement of the Tracking Tools on the Website. 18 U.S. Code § 2511(1)(a).

301.   Plaintiffs have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such Plaintiffs are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and any profits made by the tracking entities as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (2) appropriate equitable or declaratory relief; and (3) reasonable attorneys' fees and other costs reasonably incurred in accordance with the Terms.

## COUNT IV

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs Meyerowitz and Watson and the California Subclass)**

302.    Plaintiffs Meyerowitz and Watson hereby incorporate by reference and re-allege each and every allegation set forth above in all preceding paragraphs of this Complaint.

303.    Plaintiffs Meyerowitz and Watson bring this count on behalf of themselves and the **California** subMembers.

304.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with

any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section.  Cal. Penal Code § 631(a).

305.  The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020).  In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication.  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

306.  The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

307.  Within the relevant time period, Plaintiffs Meyerowitz and Watson and Class Members communicated search terms and/or their browsing history to Defendant, with the expectation of receiving video content provided by Defendant.

308.  Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs Meyerowitz and Watson and Class Members, contemporaneous with the

93

communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

309. The information collected by the Tracking Tools was not for the sole benefit of Defendant.

310. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

311. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

312. Plaintiffs Meyerowitz and Watson and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

313. The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## COUNT VI

**VIOLATION OF THE CALIFORNIA'S INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638**
**(On Behalf of Plaintiffs Meyerowitz and Watson and the California Subclass )**

314. Plaintiffs Meyerowitz and Watson hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this Complaint.

315. Plaintiffs Meyerowitz and Watson brings this count on behalf of herself and the California Subclass .

316. Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order . . . ." Cal. Penal Code § 638.51.

317. "Trap and trace device" means "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of the communication." *Id.* § 638.50(c).

318. "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

319. Defendant's Tracking Tools constitute trap and trace devices because they are devices or processes that capture incoming electronic or other impulses that identify addressing or signaling information— Plaintiffs Meyerowitz and Watson's and Class Members' Search Terms—from the electronic communications transmitted by their PCs.

320. Defendant was not authorized by any court order to use a trap and trace device to track Plaintiffs Meyerowitz and Watson's and Class Members' Intercepted Information.

95

321.    As a direct and proximate result of Defendant's conduct, Plaintiffs Meyerowitz and Watson and Class Members suffered losses and were damaged in an amount to be determined at trial.

**COUNT V**
**VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND**
**ELECTRONIC SURVEILLANCE CONTRAL ACT ("WESCA")**
**18 Pa. C.S.A. § 5701,** *et seq.*
**(On Behalf of Plaintiff Stowe and the Pennsylvania Subclass)**

322.    Plaintiff Stowe incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

323.    Plaintiff Stowe brings this claim individually and on behalf of the members of the proposed Pennsylvania Subclass against Defendant.

324.    Defendant is a "person" as defined by 18 Pa. C.S.A. § 5702.

325.    WESCA prohibits any person from willfully intercepting, endeavoring to intercept, or procuring of any other person to intercept or endeavor to intercept any wire, electronic, or oral communication. 18 Pa. C.S.A. §§ 5701, 5703(1).

326.    Defendant procured the Tracking Entities' services to "intercept" Plaintiff Stowe's and Pennsylvania Subclass Members' communications with Hearst, pursuant to WESCA, which defines "intercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S.A. § 5702.

327.    Defendant subsequently used the contents of Plaintiff Stowe's communications with the Website, intercepted and processed by the Tracking

96

Tools, to target consumers with advertising, which is prohibited under WESCA. 18 Pa. C.S.A. § 5703(2)-(3).

328.  WESCA also prohibits obtaining access to a wire or electronic communication while it is in electronic storage by intentionally: accessing without authorization, or exceeding the scope of authorization, to a facility through which an electronic communication service is provided. 18 Pa. C.S.A. § 5741(a)(1)-(2).

329.  Defendant obtained tools from the Tracking Entities to intercept and/or improperly access the communications between Defendant and its Website Users in the conduct of its business, in violation of WESCA.

330.  The devices and facilities used in this case, include, but are not limited to:

    a.  Defendant's own computers, which were used to add the Pixel to the Website's webpages;

    b.  Defendant's servers used to host its Website;

    c.  Plaintiff Stowe's and Pennsylvania Class Members' personal computing devices;

    d.  Plaintiff Stowe's and Pennsylvania Class Members' web browsers;

    e.  The Tracking Tools themselves;

    f.  Internet cookies;

    g.  The Tracking Entities' code utilized by Defendant; and

    h.  The Tracking Entities' computer servers.

331.  Defendant aided in the interception of communications between Plaintiff Stowe and Pennsylvania Class Members and Defendant that were

97

subsequently redirected to and recorded by third parties without Plaintiff Stowe's or Pennsylvania Class Members' consent.

332.    WESCA confers a private civil cause of action to any person whose wire, electronic, or oral communication is intercepted, disclosed, or used in violation thereof against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 Pa. C.S. § 5725(a).

333.    Plaintiff Stowe and the Pennsylvania Class Members are Users of Defendant's Website. Because Plaintiff Stowe and the Pennsylvania Class Members plan to continue to use Defendant's Website in the future, if Defendant's unfair, unlawful, and deceptive trade practices are allowed to continue, Plaintiff Stowe and Pennsylvania Class members are likely to suffer continuing harm in the future.

334.    Plaintiff Stowe and members of the Pennsylvania Class seek all relief available for violations of WESCA, including recovery of (1) actual damages that are not less than liquidated damages computed at a rate of $100.00 a day for each day of violation or $1,000.00, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred, along with injunctive relief.

## *Injunctive Relief Of Defendant's Ongoing Violations*

335. An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative class they seek to represent, and Defendant, which parties have a genuine and opposing interest in and which their interests are direct and substantial. Defendant has violated, and continues to violate, Plaintiffs' and Class Members' privacy rights.

336. Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims, and are thus entitled to declaratory and injunctive relief.

337. Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA and wiretap laws by Defendant. Unless enjoined by the Court, Defendant will continue to infringe on the privacy rights of Plaintiffs and Class Members, and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs and Class Members. Injunctive relief is in the public interest to protect the Sensitive Information of Plaintiffs and Class Members, and other consumers that would be irreparably harmed through continued interception and/or disclosure of their Sensitive Information.

338. Defendant completely disregards its obligation under the VPPA and wiretap by loading the Tracking Tools onto the Website and facilitating the sharing of Users' Sensitive Information with third parties for any ordinary person to access and use.

339.   Despite brazenly violating the VPPA and wiretap laws, Users were provided with no notice of the employment of the Tracking Tools and no indication of how or how much of their information was shared with third parties. Worse, in further violation of the VPPA and wiretap laws, Defendant did not seek or obtain any form of consent from Users for the use of the Tracking Tools to intercept, disclose, and use Sensitive Information communicated to the Website.

340.   This threat of injury to Plaintiffs and members of the Class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their Sensitive Information is protected from future disclosure.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)   For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)   Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Users;

(e)   For damages in amounts to be determined by the Court and/or jury;

(f)   An award of statutory damages or penalties to the extent available;

(g)   For Defendant to pay $2,500.00 to Plaintiffs and Class Members, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h)   For pre-judgment interest on all amounts awarded;

(i)   For an order of restitution and all other forms of monetary relief;

(j)   An award of all reasonable attorneys' fees and costs; and

(k)   Such other and further relief as the Court deems necessary and appropriate.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 10, 2025

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar #3569)
DELEEUW LAW LLC
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
brad@deleeuwlaw.com

*Counsel for Plaintiffs*

OF COUNSEL:
Mark S. Reich
Michael N. Pollack
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, Floor 27
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mpollack@zlk.com