**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

CHRISTOPHER STOWE, HERB MEYEROWITZ, JIM FALLOW, JAY LITTLE, MAVERICK WATSON and HEIDI FENTON, individually and on behalf of all others similarly situated,

*Plaintiffs,*

*v.*

HEARST MAGAZINE MEDIA, INC., d/b/a BICYCLING

*Defendant.*

C.A. No. 25-1128-RGA

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION


Lesley F. Wolf (No. 7348)
Emily C. Friedman (No. 7054)
*Ballard Spahr LLP*
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Fax: (302) 252-4466
WolfL@ballardspahr.com
FriedmanE@ballardspahr.com

Jonathan R. Donnellan*
Andrea R. Butler*
Kristen L. Hauser*
*The Hearst Corporation*
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

**Admitted Pro Hac Vice*

*Attorneys for Defendant Hearst Magazine Media, Inc.*


November 12, 2025

# TABLE OF CONTENTS

NATURE & STAGE OF PROCEEDINGS ........ 1
SUMMARY OF ARGUMENT ........ 1
INTRODUCTION ........ 2
I. STATEMENT OF RELEVANT FACTS ........ 3
A. Hearst's Terms of Use & Arbitration Agreement ........ 3
B. The *Bicycling* Website, Subscriptions & Other Offerings ........ 4
C. Plaintiffs' Agreements to Hearst's Terms of Use & Arbitration Agreement. ........ 7
II. ARGUMENT: Plaintiffs' Claims Should Be Stayed & Arbitration Compelled. ........ 11
A. The Federal Arbitration Act Favors Enforcement of Arbitration Agreements. ........ 11
B. Arbitration May Be Compelled Here Under Either a Motion to Dismiss or Summary Judgment Standard ........ 12
C. Plaintiffs Agreed to Hearst's Terms of Use & to Arbitrate Disputes. ........ 14
D. Plaintiffs' Claims Are Subject to the Arbitration Agreement. ........ 18
CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrett v. Konica Minolta Exec. Severance Plan*,
No. 24-05067, 2025 WL 965707 (D.N.J. March 31, 2025)....................12

*Benedict v. Guess, Inc.*,
No. 20-cv-4545, 2020 WL 5121473 (E.D. Pa. Jan. 5, 2021)....................14

*CardioNet, Inc. v. Cigna Health Corp.*,
751 F.3d 165 (3d Cir. 2014)....................13

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
584 F.3d 513 (3d Cir. 2009)....................11

*Design With Friends, Inc. v. Target Corp.*,
No. 1:21-CV-01376-SB, 2023 WL 3434013 (D. Del. May 12, 2023)....................20

*Doe v. Massage Envy Franchising, LLC*,
No. CV S20C-05-025, 2020 WL 7624622 (Del. Super. Ct. Dec. 21, 2020)....................15, 17, 19

*Erasmus v. LegalZoom.com, Inc.*,
No. CV 24-7831, 2025 WL 1122237 (D.N.J. Apr. 15, 2025)....................19

*Flores v. Chime Fin., Inc.*,
No. 21-CV-4735, 2022 WL 873252 (S.D.N.Y. Mar. 23, 2022)....................12

*Gestetner Holdings, PLC v. Nashua Corp.*,
784 F. Supp. 78 (S.D.N.Y. 1992)....................20

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000)....................11

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*,
716 F.3d 764 (3d Cir. 2013)....................12, 13

*HealthplanCRM, LLC v. AvMed, Inc.*,
458 F. Supp. 3d 308 (W.D. Pa. 2020)....................15, 17

*Hine v. LendingClub Corp.*,
No. 22-CV-00362, 2023 WL 8113234 (W.D. Pa. Nov. 22, 2023)....................16

*Home Buyers Warranty Corp. v. Jones*,
No. 15-MC-324-RGA-MPT, 2016 WL 2350103 (D. Del. May 4, 2016)....................13

*In re Bittrex, Inc.*,
No. 23-10598 (BLS)(JLH), 2025 WL 2681190 (D. Del. Sept. 19, 2025) .........................16, 18

*John Hancock Mut. Life Ins. Co. v. Olick*,
151 F.3d 132 (3d Cir. 1998)..........12

*Kirkham v. TaxAct Inc.*,
No. 24-1515, 2025 WL 914307 (3d Cir. Mar. 26, 2025)..........1, 16, 17

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009)..........11, 12

*Lloyd v. Retail Equation, Inc.*,
No. 21-17057, 2022 WL 18024204 (D.N.J. Dec. 29, 2022)..........14, 17, 18

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)..........15, 16, 17, 18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..........11

*MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*,
974 F.3d 386 (3d Cir. 2020)..........11

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)..........15

*Payne v. Samsung Elecs. Am., Inc.*,
No. N23C-03-193, 2024 WL 726907 (Del. Super. Ct. Feb. 21, 2024)..........12, 13

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*,
388 U.S. 395 (1967)..........12

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
938 F.3d 515 (3d Cir. 2019)..........19

*Saleh v. Udemy, Inc.*,
No. 23-02207, 2024 WL 1231343 (D.N.J. Mar. 21, 2024) .......... *passim*

*SBC Interactive, Inc. v. Corp. Media Partners*,
714 A.2d 758 (Del. 1998) ..........12

*Smith v. Spizzirri*,
601 U.S. 472 (2024)..........11

*Somerset Consulting, LLC v. United Cap. Lenders, LLC*,
832 F. Supp. 2d 474 (E.D. Pa. 2011) ..........13

*Steele v. Docker, Inc.*,
No. CV 24-538-RGA, 2025 WL 961379 (D. Del. Mar. 31, 2025)........................................18

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)..........................................................................................18

*Westerkamp v. Samsung Elecs. Am., Inc.*,
No. 21-cv-15639, 2023 WL 4172967 (D.N.J. June 26, 2023)...............................................14

*Young v. Experian Info. Sols., Inc.*,
119 F.4th 314 (3d Cir. 2024) ........................................................................12, 13, 14

*Zachman v. Hudson Valley Fed. Credit Union*,
49 F.4th 95 (2d Cir. 2022) ..............................................................................15, 16

**Statutes**

9 U.S.C. § 2..........................................................................................................11

9 U.S.C. § 4..........................................................................................................12

## NATURE & STAGE OF PROCEEDINGS

Plaintiffs filed their Class Action Complaint against Defendant Hearst Magazine Media, Inc. ("HMMI" or "Hearst") on September 10, 2025.[1] D.I. 1. The Complaint asserts claims under various federal and state privacy laws, including the Video Privacy Protection Act ("VPPA"), the Pennsylvania Wiretapping & Electronic Surveillance Control Act ("WESCA") and the California Invasion of Privacy Act ("CIPA"), that arise entirely from Plaintiffs' alleged visits to the Bicycling.com website, and the use of the Meta Pixel and Google Analytics on that site. D.I. 1 ¶¶ 3, 5, 32-38, 196, 263. On October 23, 2025, upon stipulation of the parties, the Court ordered Hearst to file its Motion to Compel Arbitration by November 12, 2025 and extended Hearst's time to respond to the Complaint, if required, to 30 days after the Court's ruling on the Motion. D.I. 5, 7.

## SUMMARY OF ARGUMENT

Setting aside the many pleading deficiencies in the Complaint (including whether any Plaintiff is a statutory "subscriber" under the VPPA or other law), Plaintiffs' claims are subject to arbitration in their entirety because:

1) each Plaintiff agreed to Hearst's Terms of Use (the "Terms") through their explicit agreement to those Terms by subscribing to *Bicycling* magazine, signing up for a newsletter, or otherwise interacting with Hearst in a way that required agreement to the Terms;
2) the Terms include a binding arbitration provision and class action waiver; and
3) Plaintiffs' claims are within the scope of the arbitration provision.

*See, e.g.*, *Kirkham v. TaxAct Inc.*, No. 24-1515, 2025 WL 914307, at *4 (3d Cir. Mar. 26, 2025).

---

[1] Plaintiffs' caption and D.I. 1 ¶ 38 name HMMI as the Defendant; in the introductory paragraph on page 2, they define "Defendant" as Hearst Communications, Inc. ("HCI"). HCI is the parent company of HMMI and of its affiliate magazine publishers.

## INTRODUCTION

Each of the six (6) named Plaintiff's alleged relationship with Hearst—whether as a newsletter recipient, registered website visitor, or subscriber to a print or digital version of *Bicycling* magazine—would have required agreement to Hearst's Terms of Use (the "Terms"), including the arbitration agreement and class action waiver contained within those Terms.[2] D.I. 1 ¶¶ 32-38. As a result, each claim is subject to arbitration under the Terms that each Plaintiff agreed to by virtue of signing up for the particular service they allege.

Plaintiffs' counsel has already acknowledged as much. On November 22, 2024, counsel wrote to Hearst. Ex. 1 attached hereto. In that letter, counsel asserted (as they allege here) that Plaintiff Stowe was a "subscriber" to the *Bicycling* "website", that he had claims under the Video Privacy Protection Act and other statutes based on his visit to that site, and that those claims were subject to arbitration under Hearst's Terms of Use. Ex. 1 at 5, 7. Indeed, counsel represented that the letter constituted formal notice under those Terms and Hearst's Privacy Notice (which counsel acknowledged is incorporated by reference into the Terms) and applied to Hearst's "customers". *Id*. Although Hearst disputes that it had any liability under the VPPA based on the contents of that letter, it agrees that to the extent any claim exists based on the allegations, it must be heard in arbitration, not this court.

The Hearst Terms clearly and conspicuously provided, at the very start of the Terms, that:

> WITH LIMITED EXCEPTIONS, ALL DISPUTES BETWEEN YOU AND US REGARDING THIS AGREEMENT ARE SUBJECT TO BINDING ARBITRATION ON AN INDIVIDUAL BASIS RATHER THAN JURY TRIALS, INCLUDING CLASS ACTION LAWSUITS, IN COURTS AND ONLY SPECIFIC REMEDIES ARE AVAILABLE TO YOU. Read more in section 23. Dispute Resolution (Arbitration Clause and Class Action Waiver).

[2] Should any Plaintiff's claims not be deemed subject to arbitration, Hearst intends to move to dismiss those claims under Fed. R. Civ. P. 12.

This is repeated in Section 23, to which the last sentence in the introduction hyperlinks:

> . . . any and all disputes between you and Hearst arising under or related in any way to this Agreement, must be resolved through binding arbitration as described in this section.

Declaration of Christina Dalton in Support of Defendant's Motion to Compel Arbitration dated November 12, 2025 ("Dalton Decl.") Ex. A, Sec. 23.1.

In the Complaint, each Plaintiff alleges a relationship with Hearst that would have required explicit agreement to these terms and is based on interactions they had with the Hearst website "after subscribing". D.I. 1 at 32-37, *infra* Part I.C. This is true whether they signed up for a newsletter, subscribed to *Bicycling*, or just signed into the website using their own email or a Google account. As set forth below and in the accompanying Dalton Decl., each flow provides notice of Hearst's Terms and requires Plaintiffs' consent through their action. As a result, this case should be stayed and Plaintiffs compelled to arbitrate.

## I. STATEMENT OF RELEVANT FACTS[3]

Defendant Hearst is a New York-based company that publishes magazines and operates related websites, including *Bicycling*. D.1 ¶ 38; Dalton Decl. ¶ 6. The Hearst Terms, to which Plaintiffs agreed, contain a mandatory arbitration clause requiring that any disputes arising from the subscription or use of the services be resolved through arbitration.

### A. Hearst's Terms of Use & Arbitration Agreement

At all relevant times, the use of the *Bicycling* website, like all websites operated by Hearst, have been governed by Hearst's Terms of Use. Dalton Decl. ¶ 7. Those Terms are always available for review in the footer of the *Bicycling* website (*see* Dalton Decl. ¶ 8) and are further presented to consumers in a number of ways described Parts I.B & C below.

[3] Any references to the allegations of Plaintiffs' Complaint are accepted as true only to the extent necessary and for purposes of this motion only; in many cases they are inaccurate.

From July 8, 2020 until October 6, 2025, the Terms remained unchanged. Dalton Decl. ¶ 7. A complete copy of those Terms is attached to the Dalton Decl. as Exhibit A. The very start of the Terms reads:

> BY ACCESSING OR USING THE MAGAZINE SERVICES, YOU ACCEPT AND AGREE TO BE LEGALLY BOUND BY AND COMPLY WITH THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, DO NOT ACCESS OR USE THE MAGAZINE SERVICES. SPECIFICALLY, PLEASE TAKE NOTICE THAT WITH LIMITED EXCEPTIONS, ALL DISPUTES BETWEEN YOU AND US REGARDING THIS AGREEMENT ARE SUBJECT TO BINDING ARBITRATION ON AN INDIVIDUAL BASIS RATHER THAN JURY TRIALS, INCLUDING CLASS ACTION LAWSUITS, IN COURTS AND ONLY SPECIFIC REMEDIES ARE AVAILABLE TO YOU. Read more in section 23. Dispute Resolution (Arbitration Clause and Class Action Waiver).

The blue hyperlinked text links internally to Section 23 of the Terms, which provides:

> 23. Dispute Resolution (Arbitration Clause and Class Action Waiver)
>
> PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS YOUR RIGHTS.
>
> 23.1 Except for either party's claims of infringement or misappropriation of the other party's patent, copyright, trademark, or trade secret, any and all disputes between you and Hearst arising under or related in any way to this Agreement, must be resolved through binding arbitration as described in this section. This agreement to arbitrate is intended to be interpreted broadly. It includes, but is not limited to, all claims and disputes relating to your use of any of the Magazine Services.
>
> 23.2 YOU AGREE THAT BY ENTERING INTO THIS AGREEMENT, YOU AND HEARST ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION. YOU AND HEARST AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. ANY ARBITRATION WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED.
>
> . . .

### B. The *Bicycling* Website, Subscriptions & Other Offerings

Hearst operates the *Bicycling* website, located at https://www.bicycling.com (the "Website"), which publishes content focused on the interests of cycling enthusiasts. Dalton

Decl. ¶¶ 6, 8. In addition to providing free content, Hearst offers paid subscriptions that entitle subscribers to receive access to a print magazine and/or digital content. *Id*. ¶¶ 6, 9. Hearst also permits website visitors to create a free site registration, or to sign in using an existing Google account. *Id*. ¶¶ 9-10. Subscribers to *Bicycling* automatically receive the *Bicycling* email newsletter if they provide their email at the time of subscribing or renewal, but others can sign up to receive a free newsletter. D.I. 1 ¶¶ 2-3; Dalton Decl. ¶¶ 9, 18. To access *Bicycling* content in any of these ways, at the times of each Plaintiff's interactions with Hearst, Plaintiff needed to interact with the Website in a way that required them to agree to Hearst's Terms. Dalton Decl. ¶¶ 10-21.[4]

For example, to purchase a subscription online, at all relevant times, a Plaintiff interacted with a check-out screen (*see* Part I.C below and Dalton Exs. B & C) that reads:

> By proceeding to checkout [or similar language], I agree to the Terms of Use (including the class action waiver and binding arbitration provision here). My information will be used as described in the Privacy Notice. . . . . ***or***
>
> By choosing "Complete Purchase", I agree to the Continuous Service Program and the Terms of Use (including the class action waiver and binding arbitration provisions here). My information will be used as described in the Privacy Notice.

The underlined words either turn to the color blue when the cursor passes over them or are persistently colored red as shown, and are hyperlinks to the Hearst Terms, to Section 23 of the Terms, and the Hearst Privacy Notice, respectively. Dalton Decl. ¶¶ 12-17. As demonstrated in Part I.C below, this language appears above the "CHECKOUT" or "Complete Purchase" button. *Id*. & Exs. B & C. A user cannot purchase a subscription without seeing this form and clicking one of the buttons. *Id*. ¶¶ 17.

[4] The Complaint includes images purporting to show the Website's operation. For example, **Figure 12 – "Sample search on the Website using search terms 'Video Guide'"** allegedly depicts a *Bicycling.com* search results page. D.I. 1 ¶ 162 & Fig. 12 (p. 51). That page shows links at the top right to "Subscribe" or "Sign In". *Id*.

To sign up for a free email newsletter, a Plaintiff must interact with an email entry screen (*see* Part I.C below and Dalton Exs. D & E) that reads (depending on the module):

> By signing up, I agree to the Terms of Use (including the dispute resolution procedures) and have reviewed the Privacy Notice. ***or***
>
> By signing up, I agree to the Terms of Use (including the dispute resolution procedures); my information will be used as described in the Privacy Notice.

The underlined words turn to the color blue when the cursor passes over them, and are hyperlinks to the Hearst Terms, to Section 23 of the Terms, and the Hearst Privacy Notice, respectively. Dalton Decl. ¶ 18 & Exs. D & E. As demonstrated in Part I.C below, this language appears immediately above or below the "SIGN ME UP" button. *Id*. A user cannot sign up for an email newsletter without seeing this form and clicking the button. *Id*. ¶ 18.

To sign up as a free registered user on *Bicycling.com* (or any other Hearst magazine website), or to sign in using a Google account (referred to as "Google 1-tap"), prior to finalizing their account creation, a Plaintiff must interact with a "Privacy and Terms" screen (reproduced in Part I.C below and as Dalton Exhibit F) that reads:

> By creating your account, you agree to Hearst Magazines' Terms of Use (including its class action waiver and arbitration provision) and that your information will be used as described in the Privacy Notice.

The terms persistently highlighted in blue are hyperlinks to the Hearst Terms, to the dispute resolution provision in Section 23 of the Terms, and the Hearst Privacy Notice, respectively. Dalton Decl. ¶¶ 19-20. As demonstrated in the image reproduced in Part I.C below, this language appears immediately above the blue "I AGREE" button. *Id*. A user cannot register with a Hearst magazine website without seeing this page and clicking the button. *Id*.

Finally, a Plaintiff without a digital account who renewed their subscription online in January 2022, and added their email at that time, would need to interact with a screen (reproduced in Part I.C below and as Dalton Exhibit G) that included the following language:

> Include your email to receive important subscription notices. Terms of Use & Privacy Notice/Notice at Collection.

The terms persistently highlighted in blue are hyperlinks to the Hearst Terms and the Hearst Privacy Notice, respectively. Dalton Decl. ¶ 21. As demonstrated in the image reproduced in Part I.C below, this language appeared immediately below the box to enter an email address, and above the blue "Find Your Account" button. *Id*. A user cannot retrieve their account (and thereby renew their subscription) without seeing this screen and clicking the button; if the box was not checked, they would not receive email newsletters as a result of entering their email. *Id*. ¶¶ 21 & 29.

**C. Plaintiffs' Agreements to Hearst's Terms of Use & Arbitration Agreement.**

Plaintiffs here appear to allege that they have one of three relationships with Hearst and the *Bicycling* website: they subscribed to the print magazine or have a combined print and digital subscription; they signed up for a free *Bicycling* newsletter; or they otherwise "subscribed" (*i.e*., registered) with/on the *Bicycling* website. *See supra* Part I.B-C & D.I. 1 ¶¶ 32-38. (Although the website itself does not have "subscribers", it does permit website visitors to create an account. Dalton Decl. ¶¶ 9-10.) Specifically:

- **Christopher Stowe** alleges he became a *paid "subscriber"* around January 2022. D.I. 1 ¶ 32. Although Mr. Stowe cancelled any print subscriptions he had in November 2023, Dalton Decl. ¶¶ 23-24, he also created a free account with Hearst on the *Bicycling* website on December 27, 2022, and would have had to click "I AGREE" on that date to Hearst's hyperlinked Terms (and its hyperlinked arbitration provision) as shown below. Dalton Decl. ¶ 25 & Ex. F.[5]

[5] At all relevant times, the hyperlinked Terms were as described *supra* Part I.A. *See* Dalton Decl. ¶¶ 7-8.




- **Herb Meyerowitz** alleges that he became a *paid subscriber* around 2020. D.I. 1 ¶ 33. Hearst's records show that Mr. Meyerowitz signed up for a *Bicycling* print and digital subscription on October 6, 2020. To complete his order, he would have had to agree to Hearst's hyperlinked Terms (and its hyperlinked arbitration provision) as shown below. (Dalton Decl. ¶¶ 26-27 & Ex. C)[6]




- **Heidi Fenton** alleges that she signed up for a free *Bicycling* email newsletter in or around February 2024. D.I. 1 ¶ 37. Hearst's records show that Ms. Fenton signed-up for a *Bicycling* newsletter on November 26, 2024. Dalton Decl. ¶ 36. To do so, she would have entered her email in one of the newsletter screens shown below, each of which included an agreement to Hearst's hyperlinked Terms (and its hyperlinked arbitration provision). *Id*. Exs. D& E. Hearst's records show that Ms.

[6] Although Hearst maintains illustrative examples of its checkout and other flows over time, because they are uniform across publications, it does not maintain them separately for each publication. Dalton Decl. ¶¶ 14, 16, 21. *Bicycling* screens would have been identical to those shown; only the branding would differ. *Id*.

Fenton also registered for a Hearst account on the *Bicycling* website on November 26, 2024. Dalton Decl. ¶ 35. She would have done so using the screen set forth in Dalton Ex. F (and reproduced for Mr. Stowe above), which also includes agreement to Hearst's Terms and arbitration provision.







- **Jay Little** alleges that he "purchased several magazines" "around" 2020 and signed up for a free *Bicycling* email newsletter at an unspecified date. D.I. 1 ¶ 35. Hearst has no record of a Jay Little from Indiana having any print or digital subscription to *Bicycling* and therefore cannot identify an email to check his allegation that he signed up for an email newsletter. Assuming his allegation is true, he would have entered his email in one of the screens shown above with respect to Ms. Fenton (Dalton Decl. ¶ 30 & Exs. D & E), which included an agreement to Hearst's hyperlinked Terms of Use (and its hyperlinked arbitration provision).

- **Maverick Watson** alleges he became a *paid subscriber* around 2023. D.I. 1 ¶ 36. Hearst's records show that Mr. Watson purchased a print and digital subscription to *Bicycling* on August 30, 2023. At that time, to complete his order, he would have had to agree to Hearst's hyperlinked Terms (and its hyperlinked arbitration provision) as shown below. Dalton Decl. ¶¶ 31-32 & Ex. B.




Mr. Watson also logged into the Bicycling website on August 30, 2023 using "Google 1-Tap". He would have done so using the screen set forth in Dalton Decl. ¶ 33 & Ex. F (reproduced for Mr. Stowe above), which includes agreement to Hearst's Terms (and a hyperlink directly to its arbitration provision).

- **Jim Fallow** alleges that he became a paid subscriber around 2015 and has accessed the *Bicycling* website within the past year. D.I. 1 ¶ 34. Hearst's records show that Mr. Fallow renewed a print subscription to *Bicycling* magazine on January 29, 2022 by logging into Hearst's customer care website and entering his email address, which he provided to Hearst for the first time on that date. Dalton Decl. ¶¶ 28-29. When he did so, agreed to Hearst's hyperlinked Terms as shown. *Id.* & Ex. G.



Finally, on November 22, 2024, counsel for Plaintiffs wrote to Hearst on behalf of Plaintiff Stowe. In that letter, counsel asserted (as they allege here) that Mr. Stowe was a "subscriber" to the *Bicycling* "website," that he had claims under the Video Privacy Protection Act and other statutes based on his visit to that site, and that those claims were subject to arbitration under Hearst's Terms of Use. Ex. 1.

## II. ARGUMENT: Plaintiffs' Claims Should Be Stayed & Arbitration Compelled.

As set forth above, each Plaintiff agreed to Hearst's Terms and arbitration agreement. As a result, "§ 3 of the FAA compels the court to stay the proceeding" and compel arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024). Because Plaintiffs' counsel previously agreed that the claims are subject to arbitration, "[t]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90-91 (2000).

### A. The Federal Arbitration Act Favors Enforcement of Arbitration Agreements.

"The FAA establishes a strong federal policy in favor of compelling arbitration over litigation." *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 396 (3d Cir. 2020) (citation omitted). Section 2 provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983); *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522 (3d Cir. 2009).

If a court determines that: "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement," *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009), the FAA requires the court to order the parties to proceed with

arbitration. *See* 9 U.S.C. § 4; *Saleh v. Udemy, Inc.*, No. 23-02207, 2024 WL 1231343, at *2 (D.N.J. Mar. 21, 2024). A court must enforce "a contract to arbitrate after the court 'hear[s] the parties' and is 'satisfied that the making of the agreement for arbitration . . . is not in issue[.]'" *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 318 (3d Cir. 2024) (alterations in original) (citation omitted). This involves applying "ordinary state-law principles that govern the formation of contracts." *Kirleis*, 560 F.3d at 160 (citation omitted).[7] Given the "unmistakably clear congressional purpose" behind the FAA, *Prima Paint Corp. v. Flood & Conklin Manufacturing Co*., 388 U.S. 395, 404 (1967), courts "cannot delve into the merits of an arbitrable dispute; their jurisdiction is limited to staying the civil action and compelling the parties to arbitrate the dispute." *Barrett v. Konica Minolta Exec. Severance Plan*, No. 24-05067, 2025 WL 965707, at *2 (D.N.J. March 31, 2025) (citing *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 136-37 (3d Cir. 1998)); *see also SBC Interactive, Inc. v. Corp. Media Partners*, 714 A.2d 758, 761 (Del. 1998).

### B. Arbitration May Be Compelled Here Under Either a Motion to Dismiss or Summary Judgment Standard

The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration. *See Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). "[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without

[7] Although the relevant contract is governed by New York law, whether New York or Delaware law applies, the outcome is the same. *See Payne v. Samsung Elecs. Am., Inc.*, No. N23C-03-193, 2024 WL 726907, at *5 n.83 (Del. Super. Ct. Feb. 21, 2024) ("no material difference between Delaware and New York for purposes of considering inquiry notice."); *Flores v. Chime Fin., Inc.*, No. 21-CV-4735, 2022 WL 873252, at *4 (S.D.N.Y. Mar. 23, 2022) (no conflict between New York, Delaware and California law); Dalton Ex. A § 25.

discovery's delay.'" *Id.* (citation omitted). It is only "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question'" under a Rule 56 summary judgment standard. *Id.* (alteration in original) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). "In short, discovery addressing a motion to compel arbitration is unnecessary when no factual dispute exists as to the existence or scope of the arbitration agreement." *Young*, 119 F.4th at 320.

Here, although arbitration would be appropriate under either a 12(b)(6) or a Rule 56 standard, Plaintiffs' allegations and their counsel's prior recognition of the arbitrability permit resolution under 12(b)(6). "[W]here, as here, a contract is integral to [plaintiff's] allegations (*i.e.*, he seeks relief as a customer/subscriber of [defendant]), and no competing evidence has been proffered by [plaintiff], a motion to dismiss standard applies." *Saleh*, 2024 WL 1231343, at *3; *see also CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014).[8]

Hearst's Terms (and arbitration agreement) are integral to the Complaint here. Plaintiffs rely on their alleged "subscription" (*i.e.*, some form of contractual) relationship with Hearst for their claims. D.I. 1 ¶¶ 3, 32-37, 263. Plaintiffs' counsel has previously acknowledged that the

[8] "[T]he fact that [the] Complaint does not attach, incorporate, or specifically mention the mandatory arbitration provision contained in the Dispute Resolution section of [defendant's] Terms of Use . . . does not foreclose the operation of a Rule 12(b)(6) standard." *Saleh*, 2024 WL 1231343, at *3. Nor does a consumer's failure to read Terms presented to them mean a consumer is not bound to those terms. *See Home Buyers Warranty Corp. v. Jones*, No. 15-MC-324-RGA-MPT, 2016 WL 2350103, at *4 (D. Del. May 4, 2016), *report and recommendation adopted*, 2016 WL 3457006 (D. Del. June 21, 2016); *Payne*, 2024 WL 726907, at *5, *8 ("[I]t is [Plaintiff's] own inattention in failing to look at the box or the materials contained in it that made him unaware of the contractual relationship into which he was entering with [defendant].").

claims are subject to Hearst's Terms and arbitration agreement. *See supra* p. 2 & Ex. 1. Thus, "no factual dispute exists as to the existence or scope of the arbitration agreement," *Young*, 119 F.4th at 320, and the 12(b)(6) standard is appropriate. *See Westerkamp v. Samsung Elecs. Am., Inc.*, No. 21-cv-15639, 2023 WL 4172967, at *4 (D.N.J. June 26, 2023) ("[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." (alteration in original) (quoting *Lloyd v. Retail Equation, Inc.*, No. 21-17057, 2022 WL 18024204, at *7 (D.N.J. Dec. 29, 2022))); *Saleh*, 2024 WL 1231343, at *3 (motion to dismiss standard applicable where "a contract is integral to Saleh's allegations"); *see also Benedict v. Guess, Inc.*, No. 20-cv-4545, 2020 WL 5121473, at *3 (E.D. Pa. Jan. 5, 2021) ("Precluding review of a complaint under the Rule 12(b)(6) standard simply because a plaintiff has avoided reference to an existing arbitration agreement would frustrate the purpose of the FAA: to facilitate expedited resolution of disputes where the parties to a contract have opted for arbitration.").

Even if the 12(b)(6) standard did not apply, arbitration would be appropriate under Rule 56 because, as set forth above in Part I and demonstrated in Part II.C-D below, there can be no material dispute that each named Plaintiff in this case agreed to Hearst's Terms (including its arbitration agreement and class action waiver), and that those agreements cover the dispute in this case. *See, e.g.*, *Saleh*, 2024 WL 1231343, at *3; *Young*, 119 F.4th at 320.

### C. Plaintiffs Agreed to Hearst's Terms of Use & to Arbitrate Disputes.

As set forth above in Part I.B-C, at the time each Plaintiff signed up for the *Bicycling* newsletter, signed into the *Bicycling* (or other Hearst) website, or purchased a *Bicycling* subscription, the method by which they interacted with Hearst required them to agree to Hearst's Terms. *See supra* Parts I.A-C. This was done through Hearst's check-out or sign-up "flows". *Id*. The language used in those "flows" explicitly informed subscribers that by signing up, they

agreed to the Terms of Use (often specifically to its arbitration agreement). Those processes included hyperlinks that provided conspicuous notice of the contents of the Terms (regardless of whether any Plaintiff actually read them). Those Terms include a clear, conspicuous, and enforceable arbitration clause. *See supra* Part I.A.

Such online "clickwrap" or "sign-up wrap" agreements are routinely enforced by the courts, and an "offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74-75 (2d Cir. 2017); *see also Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102-03 (2d Cir. 2022); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016); *Doe v. Massage Envy Franchising, LLC*, No. CV S20C-05-025, 2020 WL 7624622, at *4 (Del. Super. Ct. Dec. 21, 2020) ("Had Plaintiff clicked on the hyperlink and opened the document, she would have been immediately put on notice of the arbitration provision"); *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308 (W.D. Pa. 2020) ("browsewrap" agreement functioned more like clickwrap agreement due to its placement near login button). For web-based contracts, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Zachman*, 49 F.4th at 102 (alteration in original) (citation omitted); *see also Nicosia*, 834 F.3d at 233.

In *Meyer*, decided almost ten years ago, the Second Circuit thoroughly examined the enforceability of online terms and the evolving familiarity that can be assumed of website visitors and others as to the existence of binding online contractual terms. Presumably the existence of online terms governing online conduct has only become more widespread and widely known since then. *Meyer*, 868 F.3d at 77-78. Plaintiffs here all agreed to Hearst's Terms through mechanisms similar to those reviewed in *Meyer*, *Saleh*, and other cases, including

"clickwrap" agreements, in which a user checks a box or takes a similar action to indicate agreement, or via what the *Meyers* court called "Sign-In Wraps": agreements that "notify the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advise the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer*, 868 F.3d at 75-76 (citation omitted). In *Meyer*, for example, the court found "the user must click a button marked 'Register,' underneath which the screen states 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY,' with hyperlinks to the Terms of Service and Privacy Policy." 868 F.3d at 76. The court also noted:

> The Payment Screen is uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appears directly below the buttons for registration. The entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service. Although the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined.

*Id.* at 78; *see also In re Bittrex, Inc.*, No. 23-10598 (BLS)(JLH), 2025 WL 2681190, at *13 (D. Del. Sept. 19, 2025), *appeal docketed*, No. 25-2984 (3d Cir. Oct. 16, 2025) (reasonable user would know that by button, he was agreeing to the hyperlinked terms whether or not he clicked the hyperlink) (citing *Meyer*, 868 F.3d at 74-75, 79-80) (other citations omitted). The Third Circuit recently found online terms binding under similar circumstances. *See Kirkham*, 2025 WL 914307, at *4 (finding online terms binding where "users cannot complete e-filing without acknowledging", links to terms were set apart from main text by underlining and/or color, and were "in the main portion of the webpage, rather than being tucked away") (citations omitted); *see also Zachman* 49 F.4th 95 at 101; *Meyer*, 868 F.3d at 76; *Hine v. LendingClub Corp.*, No. 22-CV-00362, 2023 WL 8113234, at *1 (W.D. Pa. Nov. 22, 2023) (green hyperlinked text for

agreement readily apparent to a reasonably prudent Internet user when all other surrounding text was black); *Massage Envy*, 2020 WL 7624622, at *3-4; *HealthplanCRM*, 458 F. Supp. 3d 308.

In *Saleh*, the district court also compelled arbitration based on sign-up "flows" similar to those used by Plaintiffs here:

> [the] sign-up and checkout flows provided [Plaintiff] reasonable notice that he was agreeing to the Terms. . . . [T]he hyperlink to the Terms is presented in a clear font in a relatively uncluttered location on the screen. The immediate proximity of the notice to the "Sign up" and "Checkout" buttons, coupled with the textual notification and hyperlink to the Terms, were, in each case, "enough to place a reasonably prudent user on notice." This combination of clarity and conspicuousness, along with a plain textual notification that [Plaintiff] was agreeing to the Terms by signing up or checking out, . . . put [Plaintiff] on notice he was agreeing to the Terms.

*Saleh*, 2024 WL 1231343, at *3 (citations omitted).

As set forth in Parts I.B & C above, there can be no dispute that the process by which each Plaintiff agreed to the Hearst Terms was no less clear. Plaintiffs' use of Hearst's services was pursuant to "clickwrap" or "signup" agreements. They were required to assent to the Terms by (a) signing up for a free newsletter (Dalton Decl. ¶¶ 10, 18 & Exs. D & E); (b) purchasing or renewing a subscription (Dalton Decl. ¶¶ 10, 12-17, 19-21 & Exs. B, C, & G); or (c) by creating a free online account at *Bicycling*.com (Dalton Decl. ¶¶ 10, 19-20 & Ex. F). Here, as in *Meyer*, *Kirkham, Saleh,* and similar cases, *supra,* with some variations, each "subscription" or sign up process included language about a user's agreement to the Terms, located adjacent to the button on the screen that a user must enter for purchases, account creation, or other action (a so-called "action button"), and just below any entry of any required email address, and used language similar to the action they took. Dalton Decl. Exs. B-G. Each had hyperlinks to the Terms (and often, directly to the arbitration and class action waiver provision) in a clear font (either in a contrasting color and/or underlined). None were "tucked away". *Kirkham*, 2025 WL 914307, at *4; *see also Lloyd*, 2022 WL 18024204, at *10; *supra* Part I.A & C.

The immediate proximity of the large colored action buttons, or instructions that by taking action they were agreeing to Hearst's Terms, coupled with the textual notification and hyperlink to the Terms, were, in each case, "enough to place a reasonably prudent user on notice." *Lloyd*, 2022 WL 18024204, at *10. "This combination of clarity and conspicuousness, along with a plain textual notification that [Plaintiff] was agreeing to the Terms [of Use] by . . . checking out" suffices to create a binding agreement. *Saleh*, 2024 WL 1231343, at *3; *see also Lloyd*, 2022 WL 18024204, at *10; *Meyer*, 868 F.3d at 79-80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not"); *In re Bittrex*, 2025 WL 2681190, at *13. There can be no doubt that each Plaintiff agreed to Hearst's Terms and to arbitrate disputes with Hearst.

**D. Plaintiffs' Claims Are Subject to the Arbitration Agreement.**

In determining whether a claim is subject to arbitration, the Court's task is "to give effect to the intent of the parties." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). In evaluating arbitrability, "there is a presumption of arbitrability . . . an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Steele v. Docker, Inc.*, No. CV 24-538-RGA, 2025 WL 961379, at *3 (D. Del. Mar. 31, 2025) (citation omitted). As set forth above, there can be no dispute that each Plaintiff agreed to Hearst's Terms, and that the Terms included a class action waiver and arbitration agreement. There can also be no dispute that the arbitration agreement covers Plaintiffs' asserted claims.

The arbitration clause contained in Section 23 of the Terms provides that:

> "any and all disputes between you and Hearst arising under or related in any way to this Agreement, must be resolved through binding arbitration as described in this section. This agreement to arbitrate is intended to be interpreted broadly. It includes, but is not limited to, all claims and disputes relating to your use of any of the Magazine Services."[9] Dalton Decl. Ex. A § 23.1.

"Magazine Services" is defined as

> "your access to or use of our U.S. website, mobile application, digital membership product, other digital service, or a print or online magazine subscription." *Id*. p. 1.

Plaintiffs' claims, which relate to their alleged visits to the *Bicycling* website and use of Hearst services, *see supra* Part I.C and D.I. 1 ¶¶ 3, 32-38, 196, 263, fall squarely within the definition of these "Services" and the scope of the arbitration agreement. This is true even though Plaintiffs bring claims under various state and federal statutes, because each alleges a "subscription" relationship with Hearst that can only be achieved through agreement to Hearst's Terms of Use. *See*, *e.g.*, *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d at 524.

Here, Hearst's arbitration agreement also adequately explained to Plaintiffs they were giving up their right to bring claims in court. It repeatedly provides—in ALL CAPS—that any claim must be brought in arbitration and solely on an individualized basis. Dalton Ex. A p. 1 & § 23.2; Part I.A above. As a result, it constitutes an unambiguous class action waiver within the arbitration agreement and should be enforced. *See, e.g.*, *Erasmus v. LegalZoom.com, Inc.*, No. CV 24-7831, 2025 WL 1122237, at *7 (D.N.J. Apr. 15, 2025); *Massage Envy*, 2020 WL 7624622, at *4. The evidence is plain that Plaintiffs agreed to Hearst's Terms and to arbitrate their claims. Plaintiffs' counsel recognized as much in their correspondence with Hearst

---

[9] "When it comes to ascertaining the scope of an arbitration provision, . . . '[c]ourts have generally read the terms "arising out of" or "relating to" [in] a contract as indicative of an "extremely broad" agreement to arbitrate any dispute relating in any way to the contract.'" *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 523 (3d Cir. 2019) (alterations in original) (citation omitted). "Such broad clauses have been construed to require arbitration of any dispute between the contracting parties that is connected in any way with their contract." *Id.* (citation omitted).

threatening to bring claims in arbitration (*see supra* p. 2 & Ex. 1). Such correspondence is admissible to show that Plaintiffs knew the underlying dispute to be subject to a contractual arbitration provision. *See Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 83 (S.D.N.Y. 1992); *Design With Friends, Inc. v. Target Corp.*, No. 1:21-CV-01376-SB, 2023 WL 3434013, at *3 (D. Del. May 12, 2023) (a letter recognizing defendant's terms of use "would be strong evidence of inquiry or even actual notice" even for "browsewrap" agreements). The entirety of Plaintiffs' claims are subject to the arbitration agreement in the Terms.

**CONCLUSION**

For the reasons set forth herein, Plaintiffs should be compelled to arbitrate, and their claims should be stayed pending the completion of the required arbitration.

********

Dated: November 12, 2025

Respectfully submitted,

*/s/ Lesley F. Wolf*
Lesley F. Wolf (No. 7348)
Emily C. Friedman (No. 7054)
*Ballard Spahr LLP*
919 N. Market Street, 11th Floor
Wilmington, DE 19801
Tel: (302) 252-4465
Fax: (302) 252-4466
WolfL@ballardspahr.com
FriedmanE@ballardspahr.com

Jonathan R. Donnellan*
Andrea R. Butler*
Kristen L. Hauser*
*The Hearst Corporation*
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

**Admitted Pro Hac Vice*

*Attorneys for Defendant*
*Hearst Magazine Media, Inc.*