**fIN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRISTOPHER STOWE, HERB MEYEROWITZ, JIM FALLOW, JAY LITTLE, MAVERICK WATSON and HEIDI FENTON, individually and on behalf of all others similarly situated,<br>*Plaintiffs,*<br>*v.*<br>HEARST MAGAZINE MEDIA, INC., d/b/a BICYCLING<br>*Defendant.* | C.A. No. 25-1128-RGA |

**DECLARATION OF CHRISTINA DALTON IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION**

I, Christina Dalton, declare the following pursuant to 28 U.S.C. § 1746:

1. I am over the age of 18 and fully competent to make this Declaration.

2. I am Vice President, Growth Marketing & Email for Hearst Magazine Media, Inc. ("Hearst"), a role I have held since 2024; prior to that and since 2019, I was Vice President, Conversion & Acquisition. I have held consumer marketing roles with Hearst (or one of its JV partners) since 2005, including for *Bicycling* magazine (since Hearst acquired it).

3. My job responsibilities have included, at various points in time, supervising the design, deployment, and maintenance of consumer-facing signup website pages, newsletter sign-ups, and purchase flows, and coordinating their release with our engineering and legal teams.

4. I make this Declaration in support of Hearst's Motion to Compel Arbitration.

5. I make this declaration based on personal knowledge of the matters set forth herein, my review of business records maintained in the ordinary course at or near the time of the

events described, including those attached to (or referenced in) this declaration, and my involvement in the design and implementation of the relevant user sign-up modules, or "flows", as of the date of this declaration. If called to testify, I could and would testify competently to the facts stated herein.

6. Hearst's principal place of business is in New York City. Among its magazine publications is *Bicycling* magazine, which it has published since January 9, 2018. The *Bicycling* magazine and website provide stories, advice, and reviews to cycling enthusiasts. *Bicycling* content is available to consumers in formats including a traditional print periodical magazine, on its website, bicycling.com, and through email newsletters.

7. Use of *Bicycling* and other Hearst websites is governed by Hearst's Terms of Use (the "Terms"). From July 8, 2020, until October 6, 2025, the Terms were not updated or changed. A true and correct copy of the Terms in effect in that timeframe and saved on October 1, 2025, is annexed hereto as Exhibit A. All hyperlinks to "Terms" referenced in my Declaration are to the Terms annexed as Exhibit A.

8. Since at least 2020, *Bicycling*'s website, www.bicycling.com, has featured in its footer a link to the then-applicable Hearst's Terms, which any user would be able to access upon merely navigating to or viewing the *Bicycling* website.

9. Individuals interested in *Bicycling* content can: (a) purchase print and/or digital magazine subscriptions to *Bicycling*, allowing access to subscriber-only content and including a subscriber-only email newsletter; (b) sign up for a free *Bicycling* email newsletter; and/or (c) register for or sign into an online user account on the bicycling.com website using their email address or an existing Google or other non-Hearst account (such as signing into the website

using Google "1-tap") to access a limited amount of digital content per month, bookmark content they select so they can return to it later, and receive the free *Bicycling* newsletter.

10. To subscribe online, sign up for an email newsletter, create an account/sign-in to the *Bicycling* website with an email address, or sign into the *Bicycling* website using an existing Google or other account, a website visitor encounters a sign-up module or "flow". During the times that I understand each Plaintiff did so (see below), each flow included language adjacent to the call-to-action button (e.g., "Sign Up," "Subscribe," "Continue" or "Enter") referencing Hearst's Terms of Use (and often more specifically to its "dispute resolution" or "class action waiver and arbitration" provisions) and Hearst's Privacy Notice.

11. Regardless of the submission form, the flows included hyperlinks to referenced documents: Hearst's Terms of Use, Privacy Notice, and where the dispute resolution and/or arbitration provision was referenced, directly to Section 23 of the Terms.

12. To purchase subscriptions online, depending on the type and date of subscription, the language certain Plaintiffs were presented when purchasing a *Bicycling* subscription read:

> By [proceeding to checkout], I agree to the Terms of Use (including the class action waiver and binding arbitration provisions here). My information will be used as described in the Privacy Notice.
>
> or
>
> By choosing "Complete Purchase", I agree to the Continuous Service Program and the Terms of Use (including the class action waiver and binding arbitration provisions here). My information will be used as described in the Privacy Notice.

13. Underlined text in the former example changes to blue when the cursor hovers over it; in the latter example those words were persistently red (as shown in Exhibit C, *infra*). In each case, the underlined text are hyperlinks to the referenced document or section of a document. For example, "here" hyperlinks to Section 23 of the Terms (Exhibit A).

14. Although certain aspects of our checkout process have varied over time, the language featured above the *Bicycling* checkout buttons since at least 2020 has been as set forth above, with minor changes to correspond to whatever action must be taken to complete the checkout process. For example, if the button reads "Checkout", the language above the button would read "By proceeding to checkout . . . .". *See* example at Exhibit B, *infra*. If the button read "Complete Purchase", the language would read "By clicking "Complete Purchase", I agree to the . . . . Terms of Use (including the class action waiver and binding arbitration provisions here). . . ." above a button labelled "Complete Purchase". *See* example at Exhibit C, *infra*. The language starting with "I agree to the Terms of Use (including the class action waiver and binding arbitration provisions here) . . ." has been consistent across modules since at least 2020.

15. For example, a sample of the check-out layout in effect for combination print/digital subscriptions from late 2022 through late 2024 is below. A true and correct copy of this submission form is attached hereto as Exhibit B. Although the archived sample below shows another Hearst magazine title (*House Beautiful*), other than the specific magazine offers and branding of the magazine being ordered, most Hearst magazines, including *Bicycling* had identical checkout processes and identical language. The checkout for a *Bicycling* combination print/digital subscription would have looked the same during that time period other than the specific magazine offers and branding.




16. The check-out module for combined print/digital subscriptions in effect for the time period including October 6, 2020 is below. A true and correct copy of this submission form (with certain personal information redacted) is annexed hereto as Exhibit C. Although the archived sample below shows another Hearst magazine title (*Women's Health*), other than the specific magazine offers and branding of the magazine being ordered, most Hearst magazines, including *Bicycling* had identical checkout processes and identical language for combined print/digital subscription orders at any given point in time. The checkout for a *Bicycling* combined print/digital subscription would have looked the same during that time period other than the specific magazine offer and magazine branding.




17. In both of the previous check out module examples (Exs. B & C), whether a user was transacting on a mobile device or a computer, the visual relationship between the purchase button and the language about agreement to the Terms was the same; it was viewable on a single screen in one frame. A user could not complete a purchase without being presented with the "I agree . . ." language and clicking the "Complete Purchase" or "Checkout" buttons.

18. Since at least 2022, Hearst has used two online modules for consumers to sign up on the *Bicycling* website to receive email newsletters from their magazine of choice. True and correct copies of examples of the submission form for these modules are annexed hereto as Exhibits D & E and appear below. Regardless of the module, the language either immediately above or immediately below the "SIGN ME UP" button has read: "By signing up, I agree to the Terms of Use (including the dispute resolution procedures) and have reviewed the Privacy Notice" ***or*** "By signing up, I agree to the Terms of Use (including the dispute resolution procedures); my information will be used as described in the Privacy Notice". A user could not

sign-up for a newsletter without entering an email address and pressing the "SIGN ME UP" button.







The phrase "Terms of Use" appeared (and continues to appear) as a hyperlink that, when clicked, takes the user directly to Hearst's Terms of Use. As with our subscription check-out process, the hyperlinks turn to blue text when a cursor is moved over them. The underlined

phrase "dispute resolution procedures" is also a hyperlink that turns blue and that takes users directly to Section 23 of the Terms of Use (the Dispute Resolution section).

19. Since at least 2022, users can register and sign into Hearst magazine websites, including bicycling.com, by creating an account using an email address and a password. The following screen in the image below is presented to the user before an account is created as the last step in the process. A true and correct copy of the layout of this screen is annexed hereto as Exhibit F. The words in persistent blue text are hyperlinks to the Hearst Terms, Section 23 of the Terms, and the Privacy Notice. If the user chooses "CANCEL", the account creation is aborted by Hearst's systems and no information is captured or stored. A user cannot create an account without seeing the below screen and clicking "I AGREE."




.

20. Since July 2023, website visitors can also sign in using their existing Google accounts, a sign-in method we refer to as Google one-tap or 1-tap. If a user creates an account using Google 1-tap, the screen in Exhibit F (and described in the preceding paragraph) is presented to the user as the final step in the process. If the user chooses "CANCEL", the account

creation is aborted by Hearst's systems and no information is captured or stored. A user cannot sign in via Google 1-tap without seeing the below screen and clicking "I AGREE."

21. In the time period including January 2022, if a subscriber accessed their account using Hearst's customer service webpages, such as to renew a subscription or look up account information, if they provided an email for the first time to do so, they encountered a screen with persistent blue text, which are hyperlinks to Hearst's Terms and Privacy Notice as indicated in the below image. (While the below image does not specify *Bicycling*, it would have been the same other than the URL). A true and correct copy of a submission form showing the email entry box, checkbox, accompanying line of text, and confirmation button in place at that time is annexed hereto as Exhibit G. A user could not access the customer service portal online to complete a renewal without clicking one of the buttons. If the box is not checked, a user would not receive email newsletters.




22. I understand that there are six individuals who are named as Plaintiffs in this case. I have reviewed Hearst's records with respect to each of these individuals. Hearst's records of customers' subscription orders and related renewals, newsletter sign-ups, and website

registrations, including the methods by which users interacted with Hearst to effectuate those requests, are maintained in one or more databases depending on the type of request and interaction. Information identified in one database may be used to look up records in a different database. Those records demonstrate that each interacted with Hearst as set forth below.

23. I understand that Plaintiff **Christopher Stowe** alleges that he resides in Lewisburg, Pennsylvania and became a "paid subscriber" to Bicycling's website around January 2022. Compl. ¶ 32. Hearst has records associated with the name Christopher Stowe, a physical address in Lewisburg, Pennsylvania, and activity related to the Bicycling website in 2022 (the "Stowe Account"). The Stowe Account in Hearst's records includes the email address [redacted]@gmail.com.

24. The Stowe Account shows the renewal of print-only subscription to *Bicycling* magazine in June 2022. This subscription was canceled on November 29, 2023.

25. The Stowe Account shows that on December 27, 2022, a free site registration was successfully created on the *Bicycling* website using the email address [redacted]@gmail.com. To complete that account registration via the website, as indicated above in Paragraph 19 and Exhibit F, a user was required to provide a password and press the "I Agree" button on the "Privacy and Terms" screen.

26. I understand that Plaintiff **Herb Meyerowitz** alleges that he resides in Burbank, California and became a "paid subscriber" to *Bicycling*'s website around 2020. Compl. ¶ 33. Hearst has records associated with the name Herb Meyerowitz, a physical address in Burbank, California, and activity related to the *Bicycling* website (the "Meyerowitz Account"). The Meyerowitz Account in Hearst's records includes the email address [redacted]@meyerowitz.net.

27. The Meyerowitz Account shows that a combination print/digital subscription order for *Bicycling* was placed directly with Hearst online on October 6, 2020. As indicated above in Paragraph 16 and Exhibit C, to complete an online order for a combination print/digital subscription to *Bicycling* at that time, the user encountered the screen in Exhibit C, and would need to press the "Complete Purchase" button to finalize their subscription order.

28. I understand that Plaintiff **Jim Fallow** alleges that he resides in Batavia, Illinois and became a "paid subscriber" to Bicycling's website around 2015. Compl. ¶ 34. Hearst has records associated with the name Jim Fallow, a physical address in Batavia, Illinois, and activity related to the *Bicycling* website (the "Fallow Account"). The Fallow Account in Hearst's records includes the email address [redacted]@me.com.

29. The Fallow Account shows a print subscription order to *Bicycling* magazine that was renewed directly with Hearst via its customer care website on January 29, 2022 and that the user entered the email address now associated with the Fallow Account to begin the renewal process. The Fallow Account also indicates that the associated email was enrolled into a newsletter at that time. Because the records show email newsletter enrollment, I know that the box shown in the image at Exhibit G was checked (enabling the capture of the email address) and the user would have been presented with language with hyperlinks to Hearst's Terms and Privacy Notice, as indicated above in Paragraph 21 and Exhibit G. (The Fallow Account does not show a *Bicycling* online digital account or associated email address prior to January 29, 2022). The Fallow Account indicates that the print subscription to *Bicycling* magazine that was renewed on January 29, 2022, expired with the fall 2024 issue.

30. I understand that Plaintiff **Jay Little** alleges that he resides in Elkhart, Indiana and signed up for a free *Bicycling* email newsletter. Compl. ¶ 35. I also understand he alleges that he

"purchased several magazines" "around" 2020. Compl. ¶ 35. I caused a search to be conducted of *Bicycling*'s newsletter records and subscription records. They do not show a Jay Little in Indiana ever having purchased a print or digital subscription to *Bicycling*, and therefore Hearst has no email on record to associate with this individual based on the information in the Complaint. As a result, I cannot identify what email Mr. Little might have used to sign up for a *Bicycling* newsletter, or the details of any sign-up. Assuming he did sign up for a *Bicycling* newsletter, however, he would have done so through one of the modules attached as Exhibits D and E.

31. I understand that Plaintiff **Maverick Watson** alleges that he resides in Chico, California and became a "paid subscriber" to *Bicycling*'s website around 2023. Compl. ¶ 36. Hearst has records for the name Maverick Watson with a physical address in Chico, California and activity related to the *Bicycling* website in 2023 (the "Watson Account"). The Watson Account includes the email address [redacted]@gmail.com.

32. The Watson Account shows the purchase of a combination *Bicycling* print/digital subscription directly with Hearst online on August 30, 2023. That order was made via the *Bicycling* website featuring a screen in the form described in Paragraph 15 above, and shown in Exhibit B. As described in Paragraph 15, to complete his order Mr. Watson would need to press one of the "CHECKOUT" buttons shown in Exhibit B.

33. Hearst's records also show that the email associated with the Watson Account was used to sign into the *Bicycling* website on August 30, 2023, via the Google 1-tap feature. The final step in the Google 1-tap sign-in process on the *Bicycling* website, as indicated above in Paragraph 20 and shown in Exhibit F, required the user to press the "I AGREE" button on the

"Privacy and Terms" page to complete the process. Hearst's records show the Google 1-tap consent was recorded for this Bicycling account creation.

34. I understand that Plaintiff **Heidi Fenton** alleges that she resides in Kersey, Pennsylvania and signed up for a free *Bicycling* email newsletter in or around February 2024. Compl. ¶ 37. Hearst has records associated with the name Heidi Fenton, a physical address in Kersey, Pennsylvania, and activity related to the Bicycling website (the "Fenton Account"). The email address associated with the Fenton Account is [redacted]@icloud.com.

35. The Fenton Account shows that the email address [redacted]@icloud.com signed in to the *Bicycling* website, bicycling.com, on November 26, 2024 by entering and registering an email address. The final step in the account creation process on the *Bicycling* website, as indicated above in Paragraph 19 and shown in Exhibit F, required the user to press the "I AGREE" button on the "Privacy and Terms" page to complete the sign-up process.

36. The Fenton Account also shows that the email address [redacted]@icloud.com also signed up for the *Bicycling* newsletter on the *Bicycling* website on November 26, 2024. As I indicated in Paragraph 18 above, to sign up for an email newsletter on the *Bicycling* website required a user to enter their email address via one or the other of two modules in Exhibits D & E. After entering an email address, the user would then click "sign me up" button. The text below the button would have contained the language set forth in Paragraph 18 above and shown in Exhibits D & E.

. . . continued on following page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of November, 2025, at New York, New York.

Christina Dalton

**Christina Dalton**